In the Matter of Darrell Dean CRANE, Debtor.

MICHIGAN STEEL ERECTORS, INC., a Michigan corporation, Plaintiff,

v.

Darrell Dean CRANE, Defendant.

Bankruptcy No. 92–06274–S.
Adv. No. 92–0741–S.

United States Bankruptcy Court, E.D. Michigan, S.D.

March 16, 1993.

---

Joseph Falcone, Southfield, MI, for plaintiff.

Leonard A. Peres, Waterford, MI, for defendant.

## OPINION DETERMINING NON–DISCHARGEABILITY UNDER § 523(a)(4) ONLY

WALTER SHAPERO, Bankruptcy Judge.

### Facts and Background

This is a non-dischargeability action under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6) brought by Michigan Steel Erectors, Inc. ("plaintiff") against debtor Darrell Dean Crane ("debtor") who was the principal owner and operating officer of Crane Welding and Fabricators, Inc. ("Crane Welding"). In connection with this case the Court makes the following findings of fact:

(1) During all periods relevant to this case the plaintiff was in the business of installing and erecting structural steel. Crane Welding's business included fabricating and/or providing structural steel and making it ready for installation and erection by either itself or third parties such as the plaintiff.

(2) In 1990, Crane Welding became a sub-contractor to certain general or other contractors for structural steel erection on three (3) different jobs. In each of the three (3) jobs Crane Welding orally contracted with plaintiff as a sub-contractor to install that structural steel. Plaintiff's work constituted only part of what Crane Welding's obligations were under its other contracts on these jobs.

(3) Plaintiff and Crane Welding had some previous business dealings which appeared to have been mutually satisfactory and without untoward incident.

(4) The first of the three (3) relevant jobs was the so-called "Lantz Steel" job. On or about April 26, 1990, plaintiff and Crane Welding contracted for the former to furnish required labor and equipment to install the steel for a total of $4,200.00. Plaintiff commenced the work on April 28, 1990 and completed it on April 30, 1990. On April 30, 1990, plaintiff invoiced Crane Welding for the agreed upon $4,200.00. On or about that same date, Crane Welding invoiced J.C. Holly, the general contractor with whom it had its contract for sums

including amounts due under the contract with plaintiff. On or about May 18, 1990, J.C. Holly paid Crane Welding most of the sums due it under its contract. The remaining sums due Crane Welding were paid later in 1990. In addition to the $4,200.00, plaintiff also invoiced Crane Welding for certain extras by way of a number of invoices issued during the middle and latter part of May, 1990.

(5) The second of the three (3) relevant jobs was the so-called "Best Brand" job. Plaintiff and Crane Welding entered into an agreement on or about May 13, 1990, which required plaintiff to erect structural steel for the sum of $3,600.00. Plaintiff commenced work on May 15, 1990 and completed it approximately May 17, 1990, on which date it invoiced Crane Welding for the agreed upon $3,600.00. Crane Welding invoiced the general contractor with whom it had its contract (Campbell Mannix, Inc.) on or about May 31, 1990. On or about July 5, 1990, Campbell Mannix, Inc. paid Crane Welding $32,840.00, the same being substantially all of the sums due Crane Welding in connection with the job. Balances due Crane Welding, if any, were paid later in 1990.

(6) The third of the three (3) relevant jobs was the so-called "Voss Steel" job. Plaintiff and Crane Welding entered into their contract for that job on or about June 12, 1990 for sum of $7,137.00. Plaintiff commenced the work on or about June 15, 1990 and completed it June 20, 1990. There is some discrepancy in the testimony as to the start and completion dates. That however, is irrelevant to the outcome of this case. Plaintiff completed its performance and rendered its invoice in connection with the job on June 29, 1990. Apparently, Crane Welding rendered its invoice in advance of completion for $24,500.00 to the general contractor with whom it had its contract (J.C. Holly) on or about June 4, 1990. On June 28, 1990 or soon thereafter, Crane Welding received $21,465.00 from the general contractor and received an additional amount of $4,395.00 in late August of 1990.

(7) At the time(s) each of the oral agreements between the plaintiff and debtor with regard to each of the three (3) jobs were made, there was a similar discussion about when plaintiff would be paid. The discussion and understanding, and the statement made by debtor on behalf of Crane Welding with respect thereto, was to the effect that plaintiff would be paid when Crane Welding received its money with respect to the job from its general contractor. This became part of, and was, the agreement of the parties.

(8) The only payments made by debtor to plaintiff with respect to any of these three (3) jobs were (a) $2,000.00 on or about May 25, 1990 (the payment being in fact made by a sister of the debtor) and (b) $1,000.00 on or about September 12, 1990. Both of those payments were apparently meant to apply on amounts due on the Lantz Steel job.

(9) Starting thirty (30) days or so after completion of its performance under each of the three (3) contracts, plaintiff regularly made inquiry of debtor as to when plaintiff would be paid. It was plaintiff's testimony (and the Court finds it credible) that debtor's response was that he had not yet been paid by the general contractor. Debtor's responses were essentially false. Plaintiff testified that because of those statements by the debtor, plaintiff refrained from taking steps to enforce any construction lien rights it might have had under Michigan law.

(10) Because it had not been paid by October of 1990, plaintiff began a series of inquiries to the general contractors involved to determine whether or not what plaintiff had been told about non-payment of Crane Welding, was in fact true. As a result, plaintiff was apprised of the aforementioned actual dates and amounts of payments by the general contractors to Crane Welding. The Court further concludes from the evidence those monies were deposited in the bank account(s) and were thus commingled with other funds of Crane Welding and that Crane Welding used that money to pay various other subcontractors, and, in addition overhead ex-

penses of Crane Welding including, compensation to the debtor, payments to other employees of the debtor (including secretarial) payments on a land contract covering the business premises occupied by Crane Welding and for heat, light and power and other expenses of Crane Welding relating to its normal business operations.

(11) Plaintiff introduced no evidence attempting to trace disbursements of any of the funds received by Crane Welding from its general contractors through the commingled funds bank account or accounts of Crane Welding.

(12) As stipulated to by the parties, plaintiff is owed the sum of $18,974.50 plus finance charges of 1.5% per month from thirty (30) days after the date of billing.

### *Discussion*

▪▪▪ As to the claim of non-dischargeability asserted under § 523(a)(2) the required elements are well known. *See In re Ward*, 857 F.2d 1082 (6th Cir.1988); *In re Phillips*, 804 F.2d 930 (6th Cir.1986). Initially there is a requirement that credit had been obtained through a material misrepresentation. What debtor said and the parties agreed to in this case, *at the time the contract was made* (the work having been performed a few days thereafter in each case) was that the plaintiff would be paid when Crane Welding was. Given that the work was clearly to be performed prior to payment being reasonably expected or made, in effect the agreement between the parties was no different than any contract under which the performing party was to receive payment in due course, or at or by a specific date, after performance was completed. In such cases, contract performance occurs based on the promise of future payment. Generally speaking, in order for there to be an actionable fraud the representation made must relate to a matter of fact, ordinarily a past or existing fact, and may not be based upon the mere failure to perform a promise or an agreement to do something at a future time. *See e.g. Broaden v. Doncea*, 340 Mich. 564, 571, 66 N.W.2d 216 (1954). Or put differently, the basis for the action must exist at the time the debt arose or the transaction was entered into. *See e.g. In re Vissers*, 21 B.R. 638 (Bankr.E.D.Wis.1982). An exception arises where and if plaintiff could show that at the time debtor said he would pay plaintiff when he received the money, the debtor's undisclosed and then present intent was not to do so. *See Rutan v. Straehly*, 289 Mich. 341, 348–349, 286 N.W. 639 (1939). The fact that debtor did not eventually pay plaintiff does not perforce establish that debtor had no intention of doing so in the beginning, or at the time the contract was made. Given the amount and source of partial payments on the Lantz Steel job for instance, and the prior relationship, one might in fact conclude otherwise. As to what clearly must be taken as false statements by the debtor relative to non-receipt of payments from the general contractors, since they were made *after* plaintiff had performed the work, there does not exist the required reliance and proximate cause insofar at least as respects the obtaining of performance. As to plaintiff's alleged forbearance from taking steps to enforce its lien rights, the courts have held that plaintiff's reliance must be a reasonable one and that the misrepresentation must be the proximate cause of the loss. *See In re Phillips*, 804 F.2d 930, 932 (6th Cir.1986). Under the law, activation and perfection of plaintiff's construction lien rights date from the dates a claimant *first* furnishes labor and material and also after the *last* furnishing of same. *See* Mich.Comp.Laws Ann. § 570.-1109, *et seq.* Such are basically unrelated to when, if ever, Crane Welding was in fact paid or to be paid by the general contractors. Plaintiff's reliance was unreasonable. In fact a reasonable person probably would have pursued its lien rights if payment was starting to be delayed beyond the expected date or past the time those rights could be properly asserted. If not, the loss of the rights must be seen as being proximately caused not by the debtor's false statement, but rather the plaintiff's own delay or inaction and a conscious decision either not to pursue the lien rights or to have waited until a time when those lien

rights could legally no longer be asserted in any event.

■ Plaintiff has the burden of proof (not as debtor contends by clear and convincing evidence) but by a preponderance. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Plaintiff therefore has, for the reasons indicated, failed to meet its burden in respect to § 523(a)(2).

■ As to the claim under § 523(a)(4): (1) the "fiduciary" relationship required to exist under that Code section is satisfied by the relationships brought into being under the Michigan Building Fund Contract Act, the so-called Builders Trust Fund Act. Mich.Comp.Laws Ann. § 570.-151, *et seq.;* (2) under that act any contractor or sub-contractor who with intent to defraud retains or uses any portion of the building contract fund for any purpose other than to first pay the trust beneficiaries is guilty of a felony in appropriating trust funds to his own use; (3) the appropriation by a contractor or sub-contractor of any monies in the building contract fund before payment of monies due or become due to any trust beneficiaries is by specific statutory pronouncement evidence of intent to defraud; and, (4) the Act gives rise to a civil cause of action. *See In re Johnson*, 691 F.2d 249 (6th Cir.1982). It is quite clear that the "defalcation" required under § 523(a)(4) exists when the complained of act consists of misappropriating funds under the Michigan Builders Trust Fund Act by payment of persons other than those who are designed to be the beneficiaries of that trust fund. *Id.* Defalcation is a more encompassing term than embezzlement or misappropriation and involves an objective standard, and was "intended to cover defaults other than deliberate malversations and includes a mere deficit resulting from a fiduciary's duty to make the proper payment of money coming into his possession." *Id.* at 255. It is quite clear that the Builders Trust Fund Act is designed to protect and to create a trust fund in favor of only those laborers, sub-contractors and materialmen engaged by the statutorily determined trustee to perform labor or furnish material for the "specific improvement involved." Given the required liberal construction to achieve the desired purpose and remedy of the statute this language would seem to exclude expenditures of the kind made by the debtor in this case, i.e., officer's compensation, general overhead expenses like officer's compensation, payment of land contract payments on the building occupied by Crane Welding, and possibly heating or lighting expenses incurred as part of the general overhead of Crane Welding's operations. As noted under Section 3 of the statute, "[t]he appropriation by a contractor or any sub-contractor trust fund of any monies paid to him for building operations before the payment by him of all monies due or so to become due to laborers, sub-contractors, materialmen or others entitled to payment shall be evidence of intent to defraud."

As the *Johnson* case indicates, knowledge of the law is assumed. Therefore, the conclusion required from the facts before this Court is that plaintiff has proved its case under § 523(a)(4).

■ With respect to the claim under § 523(a)(6), one answer might be that the provision pertains primarily to torts and not contracts. *See Cadillac Vending Co. v. Haynes*, 19 B.R. 849 (Bankr.E.D.Mich. 1982). The resolution of this issue depends upon the interpretation given to the statutory terms "willful" and "malicious". Although the phrase "willful and malicious injury" has been a part of bankruptcy law since at least the Bankruptcy Act of 1898, it is not statutorily defined. *In re Druen*, 121 B.R. 509, 510 (Bankr.W.D.Ky.1990). The controlling case in the Sixth Circuit on the interpretation of these terms is *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987). *Perkins* defines "willful" as the "deliberate or intentional" commission of acts which necessarily produce injury. "Malice" is defined as a wrongful act, committed without just cause or excessive, even in the absence of personal hatred, ill-will or spite. Thus, the malice to which § 523(a)(6) refers is malice implied or imputed by law due to the nature of the act or omission, the fact that the act is, of itself, "wrong-

ful", constructively amounts to malicious intent. Accordingly, the court held that "a wrongful act done intentionally which necessarily produces harm and is without just cause or excuse ..." would constitute a willful and malicious injury excepting debts created thereby from discharge. *Id.* at 394. Therefore, for a debt to be non-dischargeable under § 523(a)(6), it must be the consequences of a wrongful act which necessarily produces harm that was "done intentionally and without just cause or excuse." *Id.; In re DeVier,* 57 B.R. 602 (Bankr.E.D.Mich.1986); *In re Klix,* 23 B.R. 187 (Bankr.E.D.Mich.1982); *Wheeler v. Laudani (In re Laudani),* 38 B.R. 632 (Bankr.E.D.Mich.1984). Appeal decided by *Wheeler v. Laudani,* 783 F.2d 610 (6th Cir.1986).

Given that debtor made payments on one of the debts and that the trust fund monies were in fact used for otherwise seemingly legitimate business expenses (albeit some which were not proper "trust fund" uses) and the fact debtor remained in business for a period of time and was in fact generating receivables and receipts, this Court cannot conclude that plaintiff has borne the required burden of proof in respect to § 523(a)(6).

Plaintiff shall prepare an order consistent with this Opinion.