**In re Victor COX, Debtor.**

**Fidelity Financial Services, Plaintiff,**

**v.**

**Victor Cox, Defendant.**

**Bankruptcy No. 99 B 2291.**
**Adversary No. 99 A 0628.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 28, 2000.

Steven J. Fink, Steven J. Fink & Associates, Ltd., Chicago, IL, for Plaintiff.

Frank G. Cortese, Law Offices of Frank G. Cortese, Chicago, IL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

JACK B. SCHMETTERER, Bankruptcy Judge.

Following trial held on Fidelity Financial Service's ("Fidelity") Complaint Objecting to the Discharge of Creditor's Debt (the "Complaint"), the Court now makes and enters Findings of Fact and Conclusions of Law. Pursuant thereto, a portion of the debt owed to Fidelity by the debtor Victor Cox will by separate judgment order be held nondischargeable under 11 U.S.C. § 523(a)(6) because that debt was incurred due to a willful and malicious injury by the debtor to Fidelity or its property.

### FINDINGS OF FACT

Victor Cox ("Cox") has worked in the collection department at Household Retail Services in Wooddale, Illinois for over three years. He bought a 1990 Nissan (the "Car") in January 1995 pursuant to Retail Sales and Security Agreement under which Fidelity was the first lienholder on the car. Its lien secured a promissory note. The car was pre-used and had been driven approximately 56,000 miles. Cox testified that he added a stereo and chrome rims to the car, spending about $2,000 for the rims and $1,800 for the stereo, but offered no documentation to substantiate these purchases. He made about two years of monthly payments to Fidelity on the promissory note, at $419 per month totaling payments of about $10,-000.

Cox began experiencing difficulty with the car about six to eight months after buying it. A mechanic informed Cox that his engine was damaged and needed to be replaced. At that time the car had been driven a total of 100,000 miles because Cox lives in Richton Park and works in Wooddale, requiring frequent round trips each about 100 miles. Cox did complain to Fidelity about problems with the engine.

Cox testified that when he was driving the vehicle on an expressway en route to his sister's house in the spring or summer of 1997 (but changed his testimony on cross examination, to say that the event transpired in 1998) his car began making a loud, banging noise close to 99th and Halsted in Chicago, Illinois. The car began smoking and eventually the motor stopped and so did the vehicle. Cox left the car and walked to his sister's home which was located a few blocks away from the stopped vehicle. Cox testifies that he later returned to the car in another vehicle with his sister and a friend and saw an orange sticker on it. He then left the auto once again and returned to his sister's house. (Neither the sister nor the friend was called to testify though both are available.)

Cox said that he returned to the car a second time and found it sitting on crates, the wheels having been removed. The car could not be pushed off the expressway. He testified that the vehicle windows were broken and someone had rummaged through the glove compartment. Cox said that he then removed the stereo equipment that he had installed in the car, and left the scene.

He testified that when he returned a third time the car was gone and he never again saw it. He did not file a police report because due to the orange sticker he thought the car had been towed by some city agency or tow service and not stolen. However, Cox did not immediately check to verify if the car had in fact been towed. He called the responsible city office a few months after the car disappeared to see if his car had in fact been towed. The city informed him that towed cars were only held for a certain period of time but advised him that because the car

was last seen by him on Interstate 57, someone working for the State of Illinois could have towed it.

Prior to that incident with the car, Cox had a history of nonpayment of his monthly car note. In fact, in July of 1997 the same car was repossessed by Fidelity. Cox later redeemed the car and entered into a new loan on July 22, 1997.

Fidelity called as its sole witness a Ms. Lieb who has worked since March 1999 as a branch manager for the Tinley Park, Illinois office of Fidelity. Lieb's current responsibilities include overseeing collections, loan applications and funding. She testified that she is aware of the collection policy of Fidelity through training and a branch manual.

Lieb previously worked at Fidelity from 1983 to 1993, serving as a customer service representative. Lieb has never met Cox but she reviewed his file folder, which contains documents that have been filed therein with account records, copies of the contracts, and related papers. One of these documents admitted into evidence as a business record was Fidelity's record of comments between Debtor and Fidelity employees.

The promissory note and security agreement indicated the amount financed, the interest rate and the vehicle as security on the loan. Title documents issued by the State of Illinois were also contained in the file.

Documents pertaining to the second loan made July 22, 1997, were also admitted. The second loan went into default for lack of payments and insurance. When a customer goes into default, Fidelity contacts that customer to find out reasons for the default, and attempts to get customers back into compliance. If that does not happen, Fidelity repossesses the collateral.

Cox was frequently behind on his payment obligations. He repeatedly promised payments that were not made. In July or August 1998, Fidelity again attempted to

repossess the vehicle, but it has been unable to find the vehicle.

The Fidelity record of communications between its representatives and Cox indicates that on August 6, 1998, a Mr. Gachino was the Fidelity collection agent on the Cox account. Gachino's duty was to review all collections account. He had authority to request repossession of collateral on non-performing loans subject to a superior's approval. Cox called and spoke to Gachino at 10:30 that day. Cox told Gachino that he could not afford the car. At 4:37 the same day Cox called Gachino again and said he would come into Fidelity's office. Cox then admitted to Gachino that he did not have the collateral vehicle. The record indicates Cox told Gachino that when the car broke down he "sold parted it." The parties dispute what the term "sold parted" meant. Cox testified that he spoke with Gachino and told him that he removed his own belongings, most particularly his stereo. Cox argues that the term "sold parted it" simply meant that he took items from the car that belonged to him and were not collateral, such as the stereo equipment. Fidelity argues that Cox meant that he sold the car for parts or for its pieces. Cox also promised Gachino that he would keep up with his obligations but Gachino told him "I'll see you in court".

Fidelity's witness Lieb testified that when a collateral vehicle is stolen, the customer usually files a police report. If a police report had been filed, Fidelity would have received the market value of the vehicle even though Cox did not maintain the required insurance, because when as here a customer does not get insurance, Fidelity obtains coverage with Balboa Insurance Company. However, under its policy, Fidelity could not file claim with Balboa because no police report was ever filed by Cox of a car theft.

On October 9, 1998, Mr. Tony Ross a Fidelity employee reviewed the record of prior calls with Cox and spoke with one Mike Greenhagen. Greenhagen is used by

Fidelity to file detinue actions when all else has failed to get a car from a customer, and that was evidently planned.

Cox filed his bankruptcy case under Chapter 7 in January 1999. Cox then owed $19,102.73 on the account.

Gachino worked for Fidelity until February of 1999 which is before Lieb resumed her employment with Fidelity, so she cannot personally verify the accuracy of Gachino's note of his conversation with Cox, though it was admitted without objection as a business record. Lieb testified, however, that the log indicates that Gachino's records were reviewed by more than one person after he left, and that Gachino could not have ordered the repossession without permission of a superior.

Cox was not a credible witness. There were several inconsistencies in his testimony. His testimony on what occurred the day the car disappeared was somewhat convoluted. It is not believable that Cox would simply assume that the sticker was a tow sticker without reading it, and his sister and friend were not called to corroborate his testimony. It is also unbelievable that he would wait several months before attempting to determine what actually happened to his car as he testified. At no time did he file a police report of theft. He did not contradict the report that he told Gachino as to the car that he had "sold parted it," but only disputed what that phrase meant. Moreover, initially Cox was sure that the events surrounding loss of the car occurred in the Spring or Summer of 1997, but when presented with the log containing conversations that transpired between himself and a Fidelity officer, he changed his testimony about that loss to the year 1998. It is not credible that he could not recall whether his car disappeared one year or two years before the trial. Finally, there was evidence from the record of his many discussions with Fidelity representatives that Cox told Fidelity's representative in August of 1998 that he wanted to keep the car, that being two months after he now says that it disappeared.

From all the evidence, it must be found that Mr. Cox sold parts from the auto and disposed of it after it had major engine trouble, all without Fidelity's permission.

Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

### *JURISDICTION*

This matter is before the Court pursuant to 28 U.S.C. § 157 and referred here by Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### *CONCLUSIONS OF LAW*

The Bankruptcy Code excepts from discharge debts arising from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The burden of proof is upon the creditor to establish that the debt is non-dischargeable by a preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The Supreme Court recently addressed a split in circuit precedents regarding the proper interpretation of the term "willful" under the discharge exception. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Court affirmed the Eighth Circuit decision that interpreted the willful element of § 523(a)(6) to render nondischargeable, debts arising from willful acts done with the actual intent to cause injury. The opinion compared willful injury to intentional torts which generally require that the actor intend "the consequence of an act" not just the "act itself". *Id.*, 523 U.S. at 61–62, 118 S.Ct. at 977, (quoting Re-

statement (Second) of Torts § 8A, Comment a, p. 15 (1964)). Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). *Id.* The Court rejected the argument that all intentional acts that cause injury were willful injuries. *Id.* Applying that interpretation, the Court reasoned, very few debts would be discharged, and almost every traffic accident or knowing breach of contract would be nondischargeable. *Id.*

■ Although *Kawaauhau* resolved divided authorities regarding the proper interpretation of willfulness under § 523(a)(6), the decision did not clearly define the scope of the term "intent" as used by the Court to describe willful conduct. Specifically the Court opinion did not indicate whether willfulness must be established by a showing that the debtor had a subjective intent to injure the creditor or whether willfulness may be established by showing that the debtor had subjective knowledge that his acts were substantially certain to cause injury.

A number of bankruptcy court opinions have held that substantial certainty of injury is insufficient to satisfy § 523(a)(6) willfulness under *Kawaauhau. See In re Buck*, 220 B.R. 999, 1004 (10th Cir. BAP 1998)(holding that the willful standard requires evidence that the debtor had "motive to harm" the creditor); *In re Tomlinson,* 220 B.R. 134, 137–38 (Bankr.M.D.Fla.1998)(stating that the Eleventh Circuit's substantially certain standard is inconsistent with *Kawaauhau* and applying a strict "intent to cause injury" standard). However, two circuit courts of appeals and several bankruptcy courts have interpreted the term "intent" under 11 U.S.C. § 523(a)(6) as enabling proof of intent to injure through proof of subjective or objective knowledge that injury is substantially certain to result. *See In re Markowitz,* 190 F.3d 455 (6th Cir. 1999); *In re Miller,* 156 F.3d 598, 603 (5th Cir.1998); *In re Budig,* 240 B.R. 397 (D.Kan.1999); *In re Kidd,* 219 B.R. 278 (Bankr.D.Mont.1998).

Although it is possible to argue from *Kawaauhau* that an injury is intentional only if the actor consciously desired to cause the injury, "under the common law the word 'intent ... denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.' " *Conte v. Gautam,* 33 F.3d 303, 308 (3d Cir.1994). The Restatement (Second) of Torts § 8A (1964) provides the following discussion of the term intent:

All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness ... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence.

*Id.* at § 8A, Comment b. The Restatement thus equates substantial certainty that a result will occur with intent to produce the result.

While the Supreme Court in *Kawaauhau,* only refers to the "desiring the consequences" portion of the Restatement, the Eighth Circuit decision in *In re Geiger* which *Kawaauhau* affirmed, quoted the substantial certainty language:

We ... think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, comment a, at 15 (1965). Unless

the actor "desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort. *Id.* *In re Geiger*, 113 F.3d 848, 852 (8th Cir. 1997).

A Montana bankruptcy court opinion expressed the need to use the substantial certainty standard particularly in conversion cases. The opinion pointed out that in a typical scenario, debtor converts creditor's collateral to debtor's own use in an attempt to avoid personal financial ruin. *In re Kidd*, 219 B.R. 278, 284 (Bankr. D.Mont.1998). Rarely is the debtor acting out of a irrelevant desire to injure the creditor, even though the injury to the creditor is almost always substantially certain to result from a debtor's actions to hide or sell the creditor's property that serves as collateral. *Id.*

The fresh start provided in bankruptcy is to protect the honest but unfortunate debtor. *In re Scott*, 172 F.3d 959, 969 (7th Cir.1999). The "substantial certainty" test is consistent with that goal in that it "focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6)". *Kidd*, 219 B.R. at 285.

■ The substantial certainty standard is also consistent with *Kawaauhau* which requires a showing that debtor intend the consequences of some harmful act. Following that reasoning, in order to prevail under § 523(a)(6), a creditor must demonstrate by preponderance of the evidence either that the debtor desired to cause the injury complained of, or that the debtor believed that harmful consequences were substantially certain to result from the debtor's acts. *Markowitz*, 190 F.3d 455, 464 (6th Cir.1999).

■ Willful injury may be established by direct evidence of specific intent. *In re Longley*, 235 B.R. 651, 657 (10th Cir. BAP 1999). In the instant case, Cox stripped

the collateral vehicle of valuable parts. Though there is no evidence that he had specific intent to harm the Fidelity company when converting parts of the collateral, the act of conversion itself had the direct and necessary consequence of taking value away from the car and therefore was done with intent to impair Fidelity's property interest in the collateral. Willful injury may be established indirectly by evidence of debtor's knowledge of the creditor's rights and knowledge that the conduct will cause particularized injury. *Id.*

■ Cox clearly had knowledge that Fidelity retained a type of interest in the car after he purchased it originally. Fidelity had repossessed Cox's car once in the past due to his habitual lack of payment. After the car was repossessed, he signed the second contract and knew that he had again given a collateral interest to Fidelity. When the car ultimately disappeared, Cox had again fallen behind on payments, and was aware that lack of payment on his part would entitle Fidelity to the car once again. Lieb testified that in fact Fidelity was in the process of repossessing the car before it disappeared, but was unable to locate it. By selling parts from the car, and hiding or selling the auto body, Cox knew that Fidelity's ability to protect itself by repossessing the car would be made impossible. Thus Cox intentionally destroyed Fidelity's security interest in the wholesale market value of that car that existed in mid 1998.

■ In addition to being found willful, Cox's actions must also be found malicious for a determination of nondischargeability under § 523(a)(6). "Malicious" under that provision means in conscious disregard of one's duties or without just cause or excuse. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Maliciousness does not require ill will or specific intent to do harm. *In re Arlington*, 192 B.R. 494, 500 (Bankr. N.D.Ill.1996). Cox was already aware from previous personal experience that

the continual failure on his part to make monthly car note payments could result in Fidelity exercising its rights as a first lienholder and repossessing the car, yet Cox proceeded to sell its valuable parts. His actions were done in conscious disregard of his duties and therefore were malicious.

Cox cites in his trial brief to the following three cases in support his argument that disposition of the car was not willful and malicious: *Williams v. Petersen,* 175 B.R. 375 (Bankr.D.Idaho 1994), *American Family Services v. Johnson,* 166 B.R. 365 (Bankr.D.Minn.1994) and *Deere Credit Services, Inc. v. Thomas,* 116 B.R. 287 (Bankr.M.D.Fla.1990).

All three cases were decided prior to *Kawaauhau* and thus are of limited value. Moreover, these cases do not support Cox, but rather support Fidelity under the facts found here because, in all three opinions cited, the debtor was found to have caused a willful and malicious injury under § 523(a)(6) after engaging in behavior similar to Cox: selling collateral without the permission of the secured party.

■ However, under 11 U.S.C. § 523(a)(6), the debt is barred from discharge only for a debt *"for* willful and malicious injury" (emphasis supplied), meaning debt incurred by the intentional harm. In this case the debt caused by intentional harm and therefore barred from discharge is only the fair cash market value of the car when Cox "sold parted it," based on the retail value that Fidelity could have realized on it if repossessed. *See In re Iaquinta,* 98 B.R. 919, 925 (Bankr.N.D.Ill.1989) (the appropriate measure of damages for conversion under § 523(a)(6) is the fair market value of the converted collateral). However, the car value was not offered into evidence. Therefore, the judgment to be entered here will declare that the retail fair cash market value of the subject car in the summer of 1998 taking into account its age and condition which included a non-functioning engine, and only that value,

comprises the debt of Cox that is nondischargeable, along with reasonable and necessary attorney's fees as provided by contract. The bankruptcy stay will be modified to permit Fidelity to seek declaration and collection of that value in a non-bankruptcy proceeding. Fidelity's request for nondischargeability of the entire debt due must therefore be denied.

## CONCLUSION

Cox intentionally converted valuable parts of the car by selling them. There is sufficient evidence to prove that Cox thereby intended to injure Fidelity's security interest because he was aware of Fidelity's interest and knew that selling of the car parts was substantially certain to cause an injury to that interest. Cox actions were willful and malicious. Therefore, to the extent Cox destroyed the car's retail value through his actions, his debt to Fidelity will be declared non-dischargeable.