In re HOWARD, Thomas Michael,
Howard, Linda Walters,
Debtors.

Conseco, f/k/a Greentree Financial
Services, Plaintiff,

v.

Thomas Howard, Defendant.

Bankruptcy No. 99–10154–6J7.
Adversary No. 00–0056.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Feb. 12, 2001.

Peter N. Hill, Wolff, Hill, McFarlin & Herron, PA, Orlando, FL, for debtors.

George E. Mills, Jr., Orlando FL, Chapter 7 Trustee.

Larry M. Foyle, Tampa, FL, for plaintiff.

*MEMORANDUM OPINION ON DE-
TERMINATION OF DISCHARGE-
ABILITY UNDER § 523(a)(2)(A)
AND § 523(a)(6)*

KAREN S. JENNEMANN, Bankruptcy
Judge.

This adversary proceeding came on for trial on September 5, 2000, on the Complaint to Determine Dischargeability of Debt (Doc. No. 1) (the "Complaint"), filed by Plaintiff, Conseco ("Conseco"), f/k/a Green Tree Financial Services ("Green Tree") against the Debtor/Defendant, Thomas Howard ("Howard"). Conseco seeks entry of a final judgment declaring Howard's debt to Conseco nondischargeable under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).[1] After reviewing the pleadings, hearing the arguments of counsel, considering the applicable law, and for the reasons discussed below, judgment is entered in favor of Conseco.

Howard is the president and owner of Sundance Motor Home Rentals, Inc. ("Sundance"), a motor home sales and rental business incorporated in July, 1984. (Plaintiff's Exhibit No. 2). At one time Howard managed Sundance operations from several different Florida locations. Eventually, he limited his business to locations in Orlando and Ft. Lauderdale, Florida. The issues raised in this adversary proceeding arose from the Orlando location.

On July 8, 1997, Sundance entered into an Inventory Financing and Security Agreement (the "Agreement") with Green Tree whereby Green Tree advanced funds to Sundance for Sundance's motor home floor plan inventory. (Plaintiff's Exhibit. No. 6). The Agreement required Howard to account for and to permit inspection of the floor plan inventory, and Green Tree took a security interest in that inventory. Howard personally guaranteed Sundance's debt to Green Tree. In order to monitor the status of its collateral, Green Tree periodically sent "floor checkers" to Sundance. Green Tree's floor checkers inspected Sundance's inventory to assure compliance with a provision in the Agreement called the "Pay as Sold Plan" (the "PASP").

Sundance was allowed to keep a motor home in its inventory for a one year period and make interest only payments on the debt due to Green Tree. If a motor home was *not* sold in the one year period, the home was returned to the manufacturer in exchange for a refund of the full wholesale value. If the motor home *was* sold in the one year period, the PASP required Howard to remit the full wholesale price owed to Green Tree promptly after each motor home's sale. Howard was permitted to retain the retail profit margin for Sundance's business operations. If a motor home was rented; however, Howard had to pay Green Tree a monthly curtailment payment in addition to the monthly interest charge to account for the expected decrease in value of the unit attributable to the renter's use of the motor home. The curtailment payments accounted for depreciation and served to reduce the principal balance on a motor home.

If a motor home was not on site at the time of a floor checker's visit, the floor checker requested documentation, such as a sales or rental contract, explaining the unit's absence. (Plaintiff's Exhibit No. 1, page 27). If Howard produced a rental contract to explain the absence, Sundance only had to pay Green Tree the monthly interest and curtailment payments. How-

---

1. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the    United States Code.

ever, if Howard produced a sales contract to explain the absence of a motor home, Sundance immediately was required to pay Green Tree the full wholesale price.

Much of Sundance's revenue was generated through motor home rentals, not sales. Some of the rentals were short-term, lasting up to a few months at a time. Other rentals lasted for up to a year. Howard testified that a significant amount of Sundance's business came from long-term rentals to movie studios filming on location. Apparently, Green Tree permitted such lengthy rentals. Howard asserts that, when Conseco purchased Green Tree in 1998, Conseco changed the rules. Conseco no longer allowed the long-term rentals. Howard testified that Sundance's business declined as a direct result of the rule change. Howard was distressed over the change and informed at least one Conseco representative that he believed the restriction on long-term rentals would force Sundance out of business. Conseco asserts that it did not change the rental rules when it purchased Green Tree. Instead, Conseco maintains that the rental periods were restricted because Conseco's floor checkers had difficulty finding and accounting for Conseco's collateral during the long-term rentals.

Eventually, Sundance did encounter financial trouble. Between August and November, 1999, Conseco's floor checkers visited Sundance on three occasions. On at least two occasions, Howard provided Conseco's floor checker with a false rental contract for a motor home that previously was sold. (Plaintiff's Exhibit No. 1, page 27). Howard obviously did not remit the necessary portion of the sales proceeds to Conseco. Howard admits he created the phony rental contracts to hide his noncompliance with the PASP provision in the Agreement. Howard does not recall exactly what he did with the proceeds from these sales. He may have reinvested some of the money in Sundance. He used some of the money to pay he and his wife a salary. (Plaintiff's Exhibit No. 1, page 56). Neither party attempted to provide an accounting on the use of the sales proceeds.

Howard admittedly knew he was required to account for all motor homes Conseco financed when Conseco's floor checkers arrived for inspection. Howard also knew that if Conseco's floor checkers believed a unit was rented instead of sold, he would only have to make the monthly interest and curtailment payments, which amounted to much less than the wholesale price Howard would have to pay Conseco if a unit was sold. In other words, Howard knew that as long as he could show the motor home as part of Sundance's inventory, he could delay his duty to remit payment under the PASP provision.

Howard argued that providing Conseco's floor checkers with phony rental contracts was not deceptive. First, Howard asserts the phony contracts were merely a way to delay payment to Conseco until he could turn Sundance's business around. (Plaintiff's Exhibit No. 1, page 41). He says he intended to repay Conseco some time in the future. Second, Howard asserted that Conseco betrayed him when Conseco restricted Sundance's long-term rentals, Perhaps Howard's first justification would be more credible were it not for Howard's palpable dislike for Conseco evidenced during the trial. Howard's testimony and more significantly his demeanor indicated that he blames Conseco for Sundance's failure. After weighing Howard's testimony, the Court concludes that Howard maliciously kept the proceeds from the two sold motor homes primarily to harm Conseco. He knew at the time that Sundance had no realistic prospect for recovering from its financial woes and would soon shut its doors and cease doing business.

Therefore, Howard did not keep the sales proceeds based on any reasonable hope the monies would save the business. Rather, he kept the monies primarily to keep Conseco from getting the payment.

Howard is a fairly sophisticated businessman. Sundance was the ninth business owned by Howard, and Howard maintains that the majority of his business ventures were successful. (Plaintiff's Exhibit No. 1, pages 10–11). Howard understood his floor plan financing arrangement with Conseco and understood his responsibilities under the Agreement including the PASP obligation. (Plaintiff's Exhibit No. 1, pages 19–20). Howard understood Conseco's security interest and knew that Conseco could demand full payment or the return of its collateral, if Conseco discovered Sundance was in default under the Agreement.

■■■ Conseco asserts that Howard's debt is nondischargeable pursuant to Bankruptcy Code Sections § 523(a)(2)(A) and § 523(a)(6). Section § 523 of the Bankruptcy Code provides in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1238(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

The burden of proof in all actions under Section § 523 is upon the plaintiff/creditor to show by a preponderance of the evidence that the debt is nondischargeable. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to dischargeability are strictly construed in favor of the debtor. *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986).

■■■ *Dischargeablity Under Section § 523(a)(2)(A).* To establish that Howard's debt to Conseco is not dischargeable under § 523(a)(2)(A), Conseco must prove that the debt is one for "money, property, services, or an extension, renewal, or refinancing of credit" obtained by "false pretenses, a false representation, or actual fraud." Conseco must show that Howard obtained such money, property, services, or credit by false representations made with the intent to deceive Conseco, Conseco justifiably relied on those representations to Conseco's detriment, and Conseco sustained damage as a result of such representations. *Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347, 350 (11th Cir.1996). Actual fraud precluding discharge "consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000) *citing* 4 Collier on Bankruptcy ¶ 523.08[1][e], pp. 523–45 (15th ed., Lawrence P. King, 2000).

Conseco's argument under § 523(a)(2)(A) is twofold. First, Conseco claims that Howard's concealment of motor home sales led to an involuntary extension of credit. Howard's deception allegedly prevented Conseco from mitigating its losses through repossession of Sundance's remaining inventory. If so, the inventory could have been timely returned to the manufacturer in exchange for a rebate of the full wholesale price. Conseco's losses

would have been dramatically reduced as a result. Second, Conseco argues that Howard wrongfully and fraudulently obtained Conseco's money or property by misappropriating the proceeds of the sales that rightfully belonged to Conseco.

■ The first issue, whether forbearance obtained by fraud or false pretenses constitutes an extension of credit, was examined in *In re Baietti,* 189 B.R. 549 (Bankr.D.Me.1995), a case similar to the instant case. In *In re Baietti,* the debtor, Richard Baietti ("Baietti") sold boats at Rick's Auto Body, Inc. ("RAB"). *Id.* at 551. Baietti entered into a floor plan financing agreement with Bombardier Capital, Inc. ("Bombardier") under which Bombardier financed boats in RAB's inventory. *Id.* Under the financing agreement, Bombardier took a security interest, and RAB was required to remit the total amount due for each boat immediately upon sale. *Id.* at 551–552. Bombardier strictly enforced this requirement and terminated floor plan financing agreements if the dealer failed to report sales. *Id.* at 552.

RAB sold five Bombardier-financed boats without reporting the sales to Bombardier or paying off the loan balances encumbering each boat. *Id.* Each sold boat remained on RAB's lot creating the appearance that the boats still were for sale. *Id.* Bombardier's floor checker assumed the boats had not been sold and, therefore, that RAB had no duty to remit full payment. *Id.* Baietti was aware of the floor checker's assumption but made no attempt to correct the assumption. *Id.* On at least two occasions Baietti initialed the floor checker's report indicating that the boats remained in inventory. *Id.* When Baietti's business failed, Bombardier dis-

covered the five unreported sales. *Id.* However, Bombardier was unable to repossess the sold boats because title to the boats had passed to RAB's retail customers free of Bombardier's security interest pursuant to Maine law. *Id.*

Bombardier claimed that Baietti's concealment of sales led to an involuntary extension of credit that Bombardier otherwise would have terminated, if it had been aware of Baietti's default. *Id.* at 556. However, the Maine Bankruptcy Court did not accept Bombardier's argument. The Court reasoned it would simply "go too far" to hold that a debtor's concealment or delayed reporting of a contract breach could constitute a nondischargeable obligation for an *involuntary* credit extension. *Id.* at 557 (*emphasis added*).

> The concept could transmogrify dischargeable breach of contract claims into nondischargeable "extension of credit" § 523(a)(2)(A) claims. The theory is sufficiently elastic to reach the claims of unsecured creditors who delayed initiating collection action... in reliance on a debtor's statement that "the check is in the mail". [Creditors] could assert that during the time that they "relied" on the "representation" the debtor's (collectible) net worth diminished, causing them "loss." Such a rule holds potential for too much mischief.

*In re Baietti* at 557 (*citing Leeb v. Guy (In re Guy),* 101 B.R. 961, 978 (Bankr. N.D.Ind.1988); *Howard & Sons, Inc. v. Schmidt (In re Schmidt),* 70 B.R. 634, 644 (Bankr.N.D.Ind.1986) (forbearing collection efforts does not constitute an extension of credit); *Drinker, Biddle & Reath v. Bacher (In re Bacher),* 47 B.R. 825, 829 (Bankr.E.D.Pa.1985) (same)).[2] In this

---

**2.** *But see In re Baietti* at 556–557 (noting the pattern of law emerging under the issue of credit extensions resulting from forbearance

obtained by false pretenses, a false representation, or actual fraud is "dicey") *citing In re Fields,* 44 B.R. 322, 329 (explaining that debt-

case, Conseco's argument that Howard's deceptive practices resulted in an "involuntary extension of credit" fails for the reasoning articulated in *Baietti*.

■ The second issue under § 523(a)(2)(A) is whether Howard wrongfully and fraudulently obtained Conseco's money or property by failing to remit the proceeds of the sold motor homes as required under the PASP. In the Eleventh Circuit, a debtor must gain a benefit from the money that was obtained by fraudulent means. *In re Bilzerian*, 100 F.3d 886, 890 (11th Cir.1996). That is, "[i]f the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Id.* at 890, n. 4.

There is no question that Howard benefited by keeping monies rightfully belonging to Conseco or that Howard obtained these monies by fraudulent means. Howard used some of the money to pay he and his wife a salary. Howard admits deliberately creating phony rental contracts to conceal his receipt of the sales proceeds and his failure to pay the monies to Conseco as required under the PASP. Howard's specific design in creating the phony contracts was to deceive Conseco's floor checkers into thinking a unit was rented instead of sold so that he would not have to remit the full wholesale price to Conseco. Howard knew that if Conseco discovered he was in default, Conseco could terminate the floor plan financing and repossess its collateral.

Howard committed false representations or actual fraud, intending to deceive Conseco, when he knowingly and deliberately

provided Conseco's floor checkers with contracts indicating that motor homes subject to Conseco's security interest had been rented when they had actually been sold. Conseco vigorously policed the Agreement with Sundance, sending floor checkers to Sundance unannounced, at frequent and regular intervals. *See In re Baietti* at 558 (*citing Michigan Steel Erectors, Inc. v. Crane (In re Crane)*, 154 B.R. 60, 64 (Bankr.E.D.Mich.1993); *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 708 (Bankr.N.D.Okla.1992); *First Leasing and Funding, Inc. v. Black (In re Black)*, 113 B.R. 79, 83 (Bankr.M.D.Fla.1990)). The contracts Howard gave the floor checkers to explain the missing inventory appeared to be legitimate rental contracts, and the floor checker's reliance on the contracts was justifiable—nothing in the rental contracts would have triggered any suspicion. Moreover, Howard further propagated the fraud and maintained the appearance of legitimate rental scenarios by remitting the interest and curtailment payments under the phony contracts to avoid suspicion. Lastly, Conseco was damaged as a result of Howard's actions. Conseco lost both the sold motor homes and the resulting sale proceeds. Conseco has met its burden of proof under § 523(a)(2)(A). Accordingly, Howard's debt to Conseco is not dischargeable.

■ *Dischargeability Under Section § 523(a)(6)*. In addition to alleging nondischargeability under § 523(a)(2)(A), Conseco alleged that Howard's debt was nondischargeable under § 523(a)(6). Section

---

or's failure to remit inventory sales proceeds to secured party by deceiving inventory checkers constituted obtaining property rather than an extension of credit;) *In re Burgess*, 955 F.2d 134 (1st Cir.1992); *FDIC v. Cerar (In re Cerar)*, 84 B.R. 524 (Bankr.C.D.Ill. 1988), aff'd, 97 B.R. 447, 451 (C.D.Ill.1989); *Zarate v. Baldwin (In re Baldwin)*, 578 F.2d

293, 295 (10th Cir.1978); *Marine Bank Southwest v. Hoffman (In re Hoffman)*, 80 B.R. 924, 926 (Bankr.N.D.Ill.1988); *First Federal Savings and Loan Assoc. v. Mancini (In re Mancini)*, 77 B.R. 913, 916 (Bankr.M.D.Fla.1987); *First Bank v. Eaton (In re Eaton)*, 41 B.R. 800, 802 (Bankr.E.D.Wis.1984).

§ 523(a)(6) of the Bankruptcy Code provides an exception to discharge when a debtor willfully and maliciously injures another entity or the property of another entity. 11 U.S.C. § 523(a)(6). To except a debt from discharge under the willful and malicious discharge exception in § 523(a)(6), a plaintiff must prove each of the § 523(a)(6) elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Thus, a plaintiff must prove by a preponderance that a debtor: 1) deliberately and intentionally; 2) injured the plaintiff or the plaintiff's property; by 3) a willful and malicious act. 11 U.S.C. § 523(a)(6); *Grogan* at 287, 111 S.Ct. 654; *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163–65 (11th Cir.1995).

Willfulness and malice are not identical for debt dischargeability purposes. "Willfulness" implies intentional behavior, while "malice" connotes malevolent purpose for action. *In re Crisafi*, 205 B.R. 444, 446 (Bankr.M.D.Fla.1996). In *In re Walker*, the Eleventh Circuit addressed what type of conduct would constitute a "willful and malicious injury." *In re Walker*, 48 F.3d 1161 (11th Cir.1995). The Eleventh Circuit found that an injury is willful when a debtor commits an intentional act for the purpose of causing injury or which is substantially certain to cause injury. *In re Walker* at 1165. An act that is merely reckless does not amount to a willful act for the purposes of debt dischargeability. *In re Walker* at 1163–64 (*citations omitted*). A malicious act is one which is "wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill-will." *In re Walker* at 1163–64.

In 1998, the Supreme Court re-examined the meaning of willfulness in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998). In *Kawaauhau*, the issue was whether medical malpractice, attributable to negligent or reckless conduct, constituted a nondischargeable debt under § 523(a)(6). After the Supreme Court confirmed that neither reckless nor negligent conduct could sustain a finding of nondischargeability under § 523(a)(6), the Court turned to the question of what type of conduct *would* result in a nondischargeable debt. Because the word "willful" in (a)(6) modifies the word "injury," the Court found that nondischargeability required a deliberate act taken with the intention to cause an injury, not merely a deliberate act taken that ultimately but unintentionally leads to injury. *In re Tomlinson*, 220 B.R. 134, 137 (Bankr.M.D.Fla.1998) (*citing Kawaauhau* at 977). The Supreme Court restricted the scope of § 523(a)(6) to exclude a wide array of everyday situations in which an act is intentional but the resulting injury is unintended. *Id.* For example, "[e]very traffic accident stemming from an initial intentional act, such as intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic, could fit the description." *Id.*

In *Kawaauhau*, the Supreme Court unequivocally held that neither reckless nor negligent conduct gives rise to nondischargeable debt. *Kawaauhau* at 64, 118 S.Ct. 974. The Court also indicated that willfulness is properly interpreted as "actual intent to cause injury." *Kawaauhau* at 61, 118 S.Ct. 974. However, the Supreme Court did not clearly define the scope of the requisite intent as needed to establish willful conduct. *In re Cox*, 243 B.R. 713, 718 (Bankr.N.D.Ill.2000). Specifically, the Supreme Court did not indicate whether willfulness must be established by: 1) a showing that the debtor had a *subjective intent to injure* the creditor; or 2) a showing that the debtor had

subjective knowledge that his acts were *substantially certain to cause injury. Id.*

One bankruptcy appellate panel and several bankruptcy courts have held that substantial certainty of injury alone is *not* sufficient to satisfy § 523(a)(6) willfulness under *Kawaauhau.*[3] However, two circuit courts of appeals, one bankruptcy appellate panel, and several bankruptcy courts have accepted subjective or objective knowledge that injury is substantially certain to result to meet the intent test of *Kawaauhau.*[4] Furthermore, the Supreme Court did affirm the Eighth Circuit's decision, in which the Eighth Circuit adopted the "substantial certainty" test:

> We ... think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, comment a, at 15 (1965). Unless the actor "desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort.

*See In re Cox* at 718–719 (*citing In re Geiger,* 113 F.3d 848, 852 (8th Cir.1997)).

■ In this case, the evidence is sufficient to declare Howard's debt to Conseco nondischargeable under either standard. Howard testified that if Conseco had not purchased Green Tree and restricted long-term rentals, Sundance would have survived. Howard quite clearly blamed Conseco for Sundance's failure, and, on at least two occasions, Howard sold a motor home and misappropriated the proceeds.[5] To cover up the misappropriation, Howard created false rental contracts with the specific intent to deceive Conseco's floor checkers into thinking the motor homes had been rented. Howard rationalized his actions as retaliation for Conseco's long-term rental restriction. He knew Sundance was failing, had no chance to continue operating, and sold at least two homes

---

**3.** *See In re Buck,* 220 B.R. 999, 1004 (10th Cir. BAP 1998) (holding that the willful standard requires evidence that the debtor had "motive to harm" the creditor); *In re Tomlinson,* 220 B.R. 134, 137–38 (Bankr.M.D.Fla. 1998) (the Eleventh Circuit's substantially certain standard may be inconsistent with *Kawaauhau* and applying a strict "intent to cause injury" standard).

**4.** *See e.g., In re Cox,* 243 B.R. 713 (Bankr. N.D.Ill.2000) (creditor need only show that debtor had subjective knowledge that debtor's acts were substantially certain to cause injury); *In re Baldwin,* 245 B.R. 131 (9th Cir. BAP 2000) (adopting *In re Miller*) *In re Markowitz,* 190 F.3d 455 (6th Cir.1999) (creditor must demonstrate either that the debtor desired to cause the injury complained of, or that the debtor believed harmful consequences were substantially certain to result); *In re Miller,* 156 B.R. 598, 603 (5th Cir.1998) (an injury is willful and malicious when there is either an objective substantial certainty of

harm or a subjective motive to cause harm); *In re Budig,* 240 B.R. 397 (D.Kan.1999) (injury is "willful and malicious," for debt dischargeability purposes, if it was substantially certain to occur as result of debtor's actions); *In re Kidd,* 219 B.R. 278 (Bankr.D.Mont.1998) (the "substantial certainty" test is consistent with the goal of protecting the honest but unfortunate debtor because it "focuses on whether the injury was in fact anticipated by the debtor, and thus insulates the innocent collateral conversions from non-dischargeability" under § 523(a)(6)).

**5.** The 11th Circuit has previously held that debts obtained by a personal debtor, as a corporate officer, will not be discharged pursuant to § 523(a)(6) when the debtor fails to remit proceeds of automobile sales in violation of a floor plan financing agreement. *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir.1987); *See also Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1264 (11th Cir.1988).

out of trust with the actual intent to harm Conseco. Because the act was taken with the actual intent to harm, Howard also knew with substantial certainty that Conseco would be harmed. Therefore, under either test, Howard deliberately and intentionally injured Conseco by a willful and malicious act.

Other courts have held that a debtor has not committed a willful and malicious act, within the meaning of § 523(a)(6), when the debtor used a secured creditor's property without the creditor's consent in a manner inconsistent with the terms governing the secured credit arrangement to keep the debtor's business afloat. The issue of whether or not the failure to remit proceeds generated from the sale of a secured creditor's collateral gives rise to nondischargeable debt under § 523(a)(6) has been addressed by at least three bankruptcy cases following the Supreme Court's *Kawaauhau* decision. *In re Crump*, 247 B.R. 1 (Bankr.W.D.Ky.2000) (debtor's failure to remit proceeds subject to a security interest was not willful and malicious where debtor's intent was to keep his business afloat, there was no evidence that debtor had any intent to harm, and there was significant evidence of debtor's good intent); *In re Tomlinson*, 220 B.R. 134 (Bankr.M.D.Fla.1998) (debtor's failure to turn over all inventory sale proceeds was not willful and malicious where debtor reinvested proceeds in debtor's business, voluntarily surrendered remaining inventory, and creditor continued to ship merchandise to debtor after creditor's periodic inspections revealed that debtor had failed to remit certain sale proceeds in violation of security agreement); *In re Wikel*, 229 B.R. 6 (Bankr.N.D.Ohio 1998) (debtor did not willfully and maliciously injure creditor's collateral by using accounts receivable funds subject to a security interest to pay unsecured business debts without secured creditor's consent where debtor avoided contact with secured creditor, but where debtor had no intent to injure creditor's collateral, rather, debtor intended to preserve the value of the collateral and the value of the business as a going concern so that the business might be sold).

The instant case is distinguishable from the above cases in one key respect. In each of the above cases, the debtors' principal motive was to keep the business alive. In this case, Howard's motives were less than altruistic. Howard's argument that he did not intend to harm Conseco is not credible. Howard's true intent in misappropriating Conseco's proceeds was to exact retribution from Conseco for restricting long-term motor home rentals. (Plaintiff's Exhibit No. 1, page 41). The evidence, when viewed in light of Howard's business background, Howard's admitted misrepresentations to Conseco's floor checkers, Howard's understanding that Conseco had a right to foreclose the collateral, Howard's open dislike and hostility towards Conseco, together with the fact that Howard blames Conseco for Sundance's failure, demonstrates that Howard intended to injure Conseco by choosing not to remit the proceeds from at least two motor home sales. His actions were intentional, willful, and malicious and resulted in a substantial injury to Conseco. Accordingly, Howard's debt to Conseco also is nondischargeable under § 523(a)(6). A final judgment in favor of Conseco and against the Debtor consistent with this memorandum opinion shall be entered.