In re Tamara L. WIKEL, Debtor.

National City Bank, Northwest, Plaintiff,

v.

Tamara L. Wikel, Defendant.

Bankruptcy No. 97–3290.
Related No. 97–30553.

United States Bankruptcy Court,
N.D. Ohio.

Sept. 22, 1998.

Johna M. Bella, Toledo, OH, for plaintiff.

C. Drew Griffith, Toledo, OH, for defendant.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court after Trial on Complaint to Determine Dischargeability of Debt. This Court has reviewed the arguments of counsel, exhibits, and the entire record of the case. Based upon that review, and for the following reasons, the Court finds that the Defendant's debt to the Plaintiff is dischargeable.

### FACTS

On November 14, 1994, Defendant, through a corporation of which she was sole officer, director, and shareholder, sought funds from the Plaintiff to acquire the inventory and fixed assets of a company called Mid–Am Sales Associates (hereafter "Mid–Am Sales"). The Plaintiff granted the Defendant the loan, taking a security interest in all the assets of the business, including accounts receivable. The Plaintiff also obtained a personal guarantee from the Defendant. The loans consisted of a Ninety Four Thousand Dollar ($94,000.00) term loan, and a Fifty Thousand Dollar ($50,000.00) line of credit. The business remained marginally profitable for a couple of years and on January 23, 1996, the Plaintiff even increased the line of credit to One Hundred Thousand Dollars ($100,000.00.)

Unfortunately, Mid–Am Sales never proved to be an entirely successful operation. As early as March of 1996, the Defendant, through her accountant Royal Barber, sought to find a purchaser for the business. Barber was able to generate some interest, but a sale was never consummated.

In October of 1996, a meeting was held at Barber's office between the Defendant, a potential purchaser, and representatives of the Plaintiff. One of the representatives of the Plaintiff present at the meeting was Kimberly Turcol, who at the time was a small business lending officer, but who, at the time of trial (she was present as a witness) was an area manager. At the meeting, the potential purchaser indicated a willingness to buy the business by the end of the year. The Defendant, in turn requested a further extension of the business' credit line from the Plaintiff, so that she could maintain the business and keep it marketable in the interim. At trial, Turcol testified that the Plaintiff declined to increase the credit line because it did not believe the business had the capacity to pay the additional amounts back. The representatives of the Plaintiff were thus aware that the business was having trouble, but still believed it had the capacity to repay the existing loans.

What happened next is the source of contention between the parties. On the Wednesday before Thanksgiving, November 27, 1996, the Defendant, as president and manager of Mid–Am Sales, decided to stop taking additional orders. She explains that the business's three full-time sales people were a large draw on the cash flow of the business, and were not generating sufficient revenue. She also claims to have been experiencing problems getting products from vendors. It was her decision, therefore, to stop taking new orders but continue to fill previous orders and pay ongoing expenses of the business. She testified that it was her objective to preserve the business as a going concern for its eventual sale. At this time she was hopeful that the potential purchaser would actually purchase the business by the end of the year as he said, or that some other entity would likewise buy the business. She also felt that by ceasing to take further orders she could direct more attention to marketing the business for sale. However, she did not tell the Plaintiff that she had stopped taking orders. She did continue to pay herself her wages, benefits, and mileage reimbursement.

Shortly thereafter, Ms. Turcol received an anonymous phone call informing her that Mid–Am Sales had ceased operating. Instructed to investigate the situation, Ms. Turcol drove by Mid–Am Sales' place of business. She testified that there was a sign on the building which stated that the business was closed for inventory until December 2nd. Ms. Turcol then made repeated attempts to call the Defendant, but was unable to reach her. On December 12th, Ms. Turcol faxed the Defendant a brief letter stating, "I have attempted to contact you several times. I have a variety of issues I need to discuss with you and would like you to call me as

soon as possible." The Defendant testified that she should have returned Ms. Turcol's call, but was very busy. She also testified that she mentioned it to Royal Barber, her accountant, who told her to "let it ride."

The record does not reflect any further attempts by the Plaintiff to contact the Defendant. The Defendant continued to fill orders of the business, collect account receivables, pay creditors, and pay the Plaintiff. Indeed, it is not disputed that at all times prior to bankruptcy the Defendant was not in default on its obligations to Plaintiff. It does not appear that she used any funds from business for non-business purposes. She continued to draw her salary, but there has been no allegation or evidence produced at trial that she was not continuing to work in her capacity as general manager of the business.

At trial, the Plaintiff produced a Mid–Am Sales check register and copies of checks written on the Mid–Am Sales checking account. A review of these checks appears to substantiate the Defendant's testimony that the proceeds of the business were used to pay expenses of the business. Indeed, the parties do not appear to disagree that the expenses paid during this time were the unsecured debts of the business.

On February 21, 1997, the Defendant filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code. She testified that after ninety days she had determined that a sale was not going to happen. Thereafter, the Plaintiff took possession of the collateral and liquidated it.

A review of the term loan payment schedule produced at trial by the Plaintiff reveals that the balance on the term loan was Fifty-nine Thousand Six Hundred Seven and 12/100 Dollars ($59,607.12) on November 14, 1996 (shortly before the Defendant stopped taking orders), Fifty-five Thousand Five Hundred Thirty-Three and 69/100 Dollars ($55,533.69) on February 11, 1997 (just before Defendant's bankruptcy filing), Forty-eight Thousand Nine Hundred Sixteen and 24/100 Dollars ($48,916.24) on July 18, 1997 (after the liquidation of the remaining collateral, plus the accrual of interest), and Fifty-four Thousand Five Hundred Eighty-four and 01/100 Dollars ($54,584.01) on February 18, 1998 (with the accrual of interest and late charges). A similar review of the line of credit payment schedule reveals that the balance on the credit line was Ninety-six Thousand Dollars ($96,000.00) on November 15, 1996 and on the petition date, Eighty-nine Thousand Five Hundred Seventy-one and 91/100 Dollars ($89,571.91) on April 8, 1997 (apparently after the collection of cash collateral from the business after the bankruptcy was filed), and Ninety-eight Thousand Forty-seven and 28/100 Dollars ($98,047.28) on February 18, 1998 (with the accrual of interest and late charges).

Thus, it appears that the Plaintiff was able to collect Eleven Thousand Six Hundred Sixty-four and 09/100 Dollars ($11,664.09) from the liquidation of the collateral. However, in its closing brief the Plaintiff contends that the evidence shows that between November 27, 1996 and February 21, 1997, when the bankruptcy was filed, approximately Eighty-eight Thousand One Hundred Seventy-one and 33/100 Dollars ($88,171.33) in checks were drawn on the business' checking account, not including the payments made to the Plaintiff. Thus, the Plaintiff appears to contend that it was damaged in the amount of Seventy-six Thousand Five Hundred Seven and 24/100 Dollars ($76,507.24) by virtue of the Defendant's failure to notify it and surrender the collateral as of the time she stopped taking orders. However, at the time the Defendant stopped taking orders, the balance on both accounts totaled approximately One Hundred Fifty-five Thousand Six Hundred Seven and 12/100 ($155,607.12) (from above). Thus the Plaintiff, as well as the Defendant, had much to lose if the business was liquidated rather than sold.

### STATUTES

The Bankruptcy Code, Title 11 of the United States Code, provides in pertinent part:

**11 U.S.C. § 523. Exceptions to Discharge**

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this section does not discharge an individual debtor from any debt—

* * *

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

## DISCUSSION

Determinations as to the dischargeability of particular debts are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

■ The issue in this case is whether the Defendant willfully and maliciously, as those terms are intended in § 523(a)(6) of the Bankruptcy Code, converted the Plaintiff's collateral by using the cash collected from accounts receivable to pay the unsecured debts of her business. To prevail, a creditor must show that a dischargeability exception is warranted by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991).

■ The Supreme Court recently issued a decision interpreting the meaning of "willful and malicious" in § 523(a)(6). In *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) the Court explained:

> We confront this pivotal question concerning the scope of the 'willful and malicious injury' exception [to discharge]: Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury (as [the plaintiffs] urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)? The words of the statute strongly support the Eighth Circuit's reading.
>
> The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury... Moreover, as the Eighth Circuit observed, the (a)(6) formation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.' Restatement (Second) of Torts § 8A, comment a, p. 15 (1964) (emphasis added).

118 S.Ct. at 977 (footnote omitted). Thus, the § 523(a)(6) exception is limited to debts arising from acts done with the actual intent to cause injury. *In re Popa*, 140 F.3d 317 (1st Cir.1998). *Kawaauhau* effectively overrules the less restrictive interpretations of the Sixth Circuit in *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987) and *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir.1986). *In re Bullock–Williams*, 220 B.R. 345 (6th Cir. BAP 1998).

Prior to *Kawaauhau* it is well established that debts resulting from conversion of collateral can be excepted from discharge under § 523(a)(6). A further reading from *Kawaauhau* reveals that acts of conversion can continue to be a basis for nondischargeability under § 523(a)(6):

> [D]ecisions of this Court are in accord with our construction. In *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), a broker 'deprived another of his property forever by deliberately disposing of it without semblance of authority.' *Id.*, at 141, 37 S.Ct., at 39. The Court held that this act constituted an intentional injury to property of another, bringing it within the discharge exception. But in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Court explained that not every tort judgment for conversion is exempt from discharge. Negligent or reckless acts, the Court held, do not suffice to establish that a resulting injury is 'willful and malicious.' See id., at 332, 55 S.Ct. at 153.

* * *

We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6). *Kawaauhau*, 118 S.Ct. at 978.

■ It is therefore clear from the foregoing that conversion continues to be a basis for nondischargeability, as long as it was committed with the intent to cause harm, and not merely negligently or recklessly. It is also important to bear in mind the language of § 523(a)(6), which excepts from discharge debts arising from willful and malicious injury by the debtor "to another entity *or to the property of another entity.*" 11 U.S.C.

§ 523(a)(6) (emphasis added). Thus, in the case at bar it is not necessary that the Plaintiff prove that the Defendant intended to harm the Plaintiff, but only that the Defendant intended to harm the Plaintiff's collateral. That is, the Plaintiff will prevail if the Defendant intentionally caused harm to Plaintiff's collateral, such as by intentionally disposing of it. See *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), cited by the *Kawaauhau* Court (a broker deprived another of his property forever by deliberately disposing of it without semblance of authority). However, if the Defendant merely recklessly or negligently caused injury to Plaintiff's collateral, the debt is dischargeable.

While at first blush the facts of this case appear to present a close call, the Court does not find that Defendant intentionally injured Plaintiff's collateral. What makes this case appear close is the fact that the Defendant affirmatively acted to avoid contact with the Plaintiff's representatives after she had stopped taking orders for the business. It appears that she realized or at least suspected that had she told the Plaintiff that she was no longer taking orders, the Plaintiff would have taken action to collect its collateral, such as accounts receivable, at that time. She clearly would have preferred to have sold the business and, hopefully, averted her present bankruptcy. These facts point toward an inference that she intended to dispose of the Plaintiff's collateral in a manner inconsistent with the Plaintiff's wishes. However, a review of the evidence presented at trial, as well as a judgment of the credibility of the Defendant's testimony, reveals that while the Defendant may have knowingly used the Plaintiff's collateral contrary to what would have been the Plaintiff's wishes, and in breach of contract, her intent was nevertheless to preserve the value of the collateral, not to injure it. The facts of this case indicate that the Defendant was indeed attempting to preserve the going concern value of the business so that it could be sold. Also, this Court does not find that she used proceeds of the business to further her personal concerns, other than to preserve the business itself.

The Court in *In re Tomlinson*, 220 B.R. 134 (Bankr.M.D.Fla.1998), was faced with a similar situation. In *Tomlinson*, the creditor brought an action under § 523(a)(6) for the debtor's failure to surrender all the sale proceeds and inventory of his failing business. The Court, following *Kawaauhau*, allowed the discharge, explaining:

> Plaintiff has not established that defendant's retention of the inventory sale proceeds was an act intended to cause Plaintiff injury. Rather, the evidence shows that Defendant merely sought to maintain [his business] as an ongoing enterprise, and did not keep the proceeds with the intent to deliberately injure Plaintiff. In fact, once Defendant realized the company was no longer viable, he voluntarily surrendered the remaining inventory to Plaintiff.

220 B.R. at 137–138. (While this Court believes that the *Tomlinson* court erred by considering whether the debtor's intent was to injure the creditor, rather than the creditor's collateral, it does not appear that it would have changed the Court's conclusion that the debtor's attempts to preserve the going concern value showed a lack of intent to cause injury.)

The facts in the present case are very similar to those in *Tomlinson*. The Defendant was attempting to preserve the value of the business, and therefore the Plaintiff's collateral, by selling the business as a going concern. It also appears that when the Defendant realized that the business could not be sold and was no longer viable, she simply filed bankruptcy and closed the business. Further, a sale of the business would have been the only way to preserve the full value of the Plaintiff's collateral. Even if the Defendant had surrendered the collateral in November of 1996, it appears that at the most the Plaintiff would have collected Seventy-six Thousand Five Hundred Seven and 24/100 Dollars ($76,507.24) more than it did, and that is assuming that the accounts receivable collected by the Defendant could have been collected in full after the Plaintiff took possession. (Accounts receivable become much harder to collect when there is not an ongoing business.) The Defendant's

debt to the Plaintiff at that time was approximately One Hundred Fifty-five Thousand Six Hundred Seven and 12/100 Dollars ($155,-607.12). Thus, the only way the Plaintiff would not have sustained substantial losses was for the Defendant to sell the business. Perhaps this explains the Plaintiff's lack of action after mid-December, when Defendant failed to return calls.

Though the Plaintiff argues that the Defendant's actions blatantly breached the security agreement, § 523(a)(6) requires more than just a knowing breach of contract. *Bullock–Williams,* 220 B.R. at 347 (applying *Kawaauhau* ). In this case, this Court finds that while the Defendant may have acted negligently or recklessly, she did not intend to injure the Plaintiff's collateral. Thus, the Defendant's debt to the Plaintiff is dischargeable. In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

***ORDERED*** that Defendant's debt to Plaintiff be, and is hereby, *DISCHARGEABLE.*