In re Clayton V. CRUMP and Stacey S. Crump, Debtor.

Mayfield Grain Co., Inc., Plaintiff,

v.

Clayton V. Crump, Stacey S. Crump, Defendant.

Bankruptcy No. 99–50595(2)7.
Adversary No 99–5029.

United States Bankruptcy Court,
W.D. Kentucky,
Louisville Division.

March 20, 2000.

Marcus Herbert, Carbondale, IL, for Debtor.

Timothy Stark, Mayfield, KY, for Plaintiff.

Geneva Parris, Cadiz, KY, trustee.

### MEMORANDUM–OPINION

J. WENDELL ROBERTS, Bankruptcy Judge.

The above-captioned adversary proceeding was tried before this Court on January

5, 2000. At the conclusion of the trial, the undersigned delivered Findings of Fact and Conclusions of Law from the bench, and Judgment was entered on January 11, 2000 in favor of Defendants/Debtors. The matter is now before the Court on the Motion of the Plaintiff, Mayfield Grain Co., Inc. ("Mayfield Grain"), to Alter, Amend or Vacate the Judgment. Mayfield Grain challenges this Court's interpretation of the United States Supreme Court's *Kawaauhau v. Geiger* decision, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), as it applies to the facts of this case.

The Court has carefully considered Mayfield Grain's argument and has once again fully reviewed the entire file, including excerpts from the trial transcript. At the trial, the Court expressed concern with the much restricted holding of the Geiger Court but is in full agreement that inferior courts follow the decisions of higher Courts—here, the highest of all. The Court isn't persuaded by Mayfield Grain's argument and finds the Plaintiff has failed to sustain its burden of proof under 11 U.S.C. § 523(a)(6), the section of the Bankruptcy Code under which Mayfield Grain asks to have its debt declared nondischargeable. Accordingly, for the reasons set forth below, the Court will by separate Order Overrule Mayfield Grain's Motion to Alter, Amend or Vacate Judgment.

### FACTS

The facts in this case are fairly simple and largely undisputed. The Debtor, Clayton V. Crump ("Debtor"), was engaged in the business of farming in Graves County, Kentucky, a business venture he pursued for several years prior to filing for Chapter 7 relief under the Bankruptcy Code on June 1, 1999. Much of his farming operation occurred on ground he rented from his wife's grandfather, a Mr. Shelton. Most, if not all, of Debtor's assets were encumbered to the First National Bank of Mayfield, either by security agreement or real estate mortgage. While the debt to First National was incurred on an annual basis, Debtor was unable during the four years preceding bankruptcy to pay off the loan in any given year. New notes were executed each year and he continued farming, with the hope that he could not only pay off First National, but that he would earn enough net profit to pay other debts. Unfortunately, that hope never materialized.

Crop year 1998 was disastrous. Yields were only about 2/3 of the average yield and the price was approximately 1/2 of the amount received the preceding year. In the summer of 1998, Debtor had reached his maximum line of credit with First National and was also heavily indebted to the Plaintiff, Mayfield Grain Co., Inc. ("Plaintiff").

By August, 1998, Debtor's unsecured account with the Plaintiff was aging by 60 to 90 days and he reported his financial difficulties to Bobby Whitford, manager of the Plaintiff. Feeling the collection of the account might be in jeopardy, Mr. Whitford asked the Debtor to sign a Security Agreement on existing crops. The Debtors did not object, and voluntarily signed the Security Agreement. No additional funds were advanced to the Debtors by the Plaintiff after the execution of the Agreement, and the amount due and owing at that time was $42,090.87, which included at least $8,000.00 of interest.

The Debtors' 1998 crops yielded $187,801.07 and their expenses were $222,013.98. The debt to First National was $250,000 and, accordingly, nothing was available for payment on the debt at the end of that harvest season.

In the spring of 1999, the Debtor again planted crops, but in an effort to minimize his farming costs, used little fertilizer and performed most of the work with borrowed equipment. During that same period of time, he attempted to reduce his cost of living by returning collateral to First National, trading trucks so as to reduce his monthly payment, and moving out of his $100,000.00 home into a $24,000.00 mobile

home. While the evidence does not reflect the exact date Debtor first contacted an attorney about the possibility of filing bankruptcy, he made his first payment to his lawyer on April 9, 1999.

At the trial, substantial focus was paid to the Security Agreement signed by the Debtor. The Security Agreement provided blanks upon which the Debtor was to indicate grain dealers to whom he might sell his grain. Debtor ultimately sold most of the grain crop to Reed Brothers although they were not listed as a potential buyer on the Security Agreement. The Debtor's decision to sell the crop to Reed Brothers was based on an economic business decision—Reed Brothers was located only five miles from the Debtor's farm, while the other grain buyers listed by him on the Security Agreement were at least thirty miles away. Thus, the Debtor's transportation costs were far less than if the crop had been sold to a listed buyer. He did, however, sell some of the grain to the Plaintiff and the Plaintiff allowed him to take the check for the proceeds of the grain with him, without retaining any portion thereof. The Debtor deposited the various checks from the sale of grain to his farm account for the payment of farm expenses. No evidence was introduced to show that he spent the money for any other purpose.

## LEGAL DISCUSSION

### I. § 523(a)(6).

This Court begins its analysis with a review of 11 U.S.C. § 523(a)(6), the section under which Mayfield Grain seeks to have its claim declared nondischargeable. That section carves out an exception to the dischargeability of debts. It reads:

(1) A Discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

Thus, the plain language of the statute requires that the injury be *both* willful and malicious to render the debt nondischargeable.

The United States Supreme Court has analyzed this language in the relatively recent decision of *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In that decision, the Supreme Court addressed what has become the pivotal question concerning the scope of the "willful and malicious injury" exception: Whether the scope of § 523(a)(6) encompasses "acts, done intentionally, that cause injury . . . or only acts done with the actual intent to cause injury." *Id.* at 61, 118 S.Ct. at 976; *In re Markowitz,* 190 F.3d 455, 463 (6th Cir. 1999). The Supreme Court concluded that "willful and malicious injury" requires a "deliberate and *intentional injury." Geiger,* 523 U.S. at 61, 118 S.Ct. at 977. "Only acts done with the intent to cause injury— and not merely acts done intentionally— can cause willful and malicious injury." *Markowitz,* 190 F.3d at 463; *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977; *In re Abbo,* 168 F.3d 930 (6th Cir.1999); *In re Bullock–Williams,* 220 B.R. 345 (6th Cir. BAP 1998). A deliberate or intentional *act* that leads to injury is not sufficient to meet the requirement. *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977 (emphasis added); *Markowitz,* 190 F.3d at 464; *Abbo,* 168 F.3d at 930. The debtor must have *intended the consequences* of the act, not merely the act itself. *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977 (emphasis added).

The Supreme Court reached that holding by carefully analyzing the language used in § 523(a)(6). The Court held that "willful" means "voluntary," "intentional," or "deliberate." *Id.,* 523 U.S. at 61 n. 3, 118 S.Ct. at 977 n. 3. The Court further found that the word "willful" modifies the word "injury." *Id.* Thus, nondischargeability requires a deliberate or intentional injury, and not merely a deliberate or intentional act that leads to injury. *Id.; Markowitz,* 190 F.3d at 464. The Court

said that if Congress wanted to include unintentionally inflicted injuries within the scope of § 523(a)(6), it would have incorporated such language as "willful acts that lead to injury," or added "reckless and/or negligent" to modify "injury." *Markowitz*, 190 F.3d at 464.

■ In *Markowitz* the Sixth Circuit explained the scope of the § 523(a)(6) interpretation established in *Geiger*. *Id*. The Sixth Circuit said that "the (a)(6) formulation triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts." *Id*. It examined the Restatement (Second) of Torts' definition of "intentional torts" which is defined as "those motivated by a desire to inflict injury or those substantially certain to result in injury." *Id*. Although the Supreme Court cited to the Restatement (Second)'s definition, it "neither expressly adopted nor quoted that portion of the Restatement discussing 'substantially certain' consequences." *Id*. The *Markowitz* Court appears to have extended *Geiger* to coincide with the Restatement (Second)'s definition of "intentional torts." *Id*. The Sixth Circuit held that § 523(a)(6) encompasses injuries where "the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it." *Id*. (*Citing* Restatement (Second) of Torts § 8A, at 15 (1964)). Thus, the creditor must demonstrate that the debtor either (1) intended to cause injury to the creditor, or (2) engaged in an intentional act from which the debtor believed injury would be substantially certain to result.

■ The case at bar involves Debtor's failure to remit proceeds generated from the sale of a secured creditor's collateral. Two cases after *Geiger* have directly dealt with this issue in the context of § 523(a)(6). *In re Tomlinson*, 220 B.R. 134 (Bankr.M.D.Fla.1998); *In re Wikel*, 229 B.R. 6 (Bankr.N.D.Ohio 1998). In *Tomlinson*, the debtor was the sole stockholder and president of Lawn Power, Inc.

The plaintiff supplied goods and merchandise to the corporation, and had a properly perfected security interest therein. 22 B.R. at 134. The Security Agreement did not require that the sales proceeds be segregated into a separate account and the debtor commingled the sales proceeds with other funds not subject to the plaintiff's security interest. Debtor did not remit proceeds from inventory sales and when the business began to fail, it became delinquent in its payments to the plaintiff. This failure was discovered by the plaintiff during its periodic inventory inspections but it continued to ship goods and merchandise to the debtor.

The *Tomlinson* Court thoroughly analyzed the *Geiger* decision, and the standard imposed for "willfulness and maliciousness" under § 523(a)(6). The Court concluded that the debtor's conduct did not come within the scope of § 523(a)(6), finding that the debtor's purpose and intent in retaining the proceeds was to keep his business afloat, rather than being an act of spiteful passion to inflict economic pain on the secured creditor. *Id*. at 138. The Court also noted that the secured creditor had taken no action when its inventory inspection revealed that the debtor was failing to remit proceeds, and in fact, continued to ship goods and merchandise. Such conduct, the Court said, constituted an acquiescence to debtor's conduct. *Id*. The Court stated, "in light of Plaintiff's apparent acquiescence to [Debtor's] conduct, the failure to remit the proceeds can hardly be characterized as 'willful and malicious'." *Id*.

Finally, the Court noted that the secured creditor "failed to adequately protect its interest by not requiring the sale proceeds to be segregated." *Id*. While this reflects on the actions of the secured creditor in protecting its interest, it simply has no bearing on the debtor's state of mind or intent with regard to retaining the proceeds.

The other case involving a debtor's failure to remit proceeds is *In re Wikel*, 229 B.R. at 6. In that case, the debtor again was the sole officer, director and shareholder of a corporation. The plaintiff bank loaned money and extended a line of credit to the corporation for the purchase of assets and inventory. It took a security interest in all of the assets of the business, including proceeds from the sale of inventory, and obtained a personal guarantee from the debtor. The business was not successful; however, the debtor believed she had a potential purchaser who indicated a willingness to purchase the business "by the end of the year." The debtor decided to stop taking new orders at the end of November, but continued to fill previous orders and pay ongoing expenses of the business. "It was her objective to preserve the business as a going concern for its eventual sale." *Id.* at 7. She did not inform the secured creditor of this decision, and did not turn over any of the collateral. In fact, the debtor affirmatively avoided all contact with the plaintiff, refusing to answer letters and phone calls. The debtor began to use proceeds in which the plaintiff had a security interest to pay unsecured debts. The sale did not transpire, and the debtor ultimately filed for bankruptcy under Chapter 7. The plaintiff brought an adversary proceeding seeking to have the balance of the debt declared nondischargeable under § 523(a)(6).

After discussing the standard imposed by *Geiger*, the *Wikel* Court held that in order to prevail, the plaintiff must prove that the debtor either intended to harm the plaintiff or intended to harm the plaintiff's property (i.e., the collateral). *Id.* at 10. "However, if the Defendant merely recklessly or negligently caused injury to Plaintiff's collateral, the debt is dischargeable." *Id.* The Court held that the debtor did not intentionally injure the collateral. *Id.* Rather, the Court found that her intent was to preserve the value of the business as a going concern so that it could be sold. *Id.* The Court noted that the debtor did not use the proceeds to further her per-

sonal concerns, but rather used them in an effort to preserve the business, itself. *Id.* The Court stated:

> While the Defendant may have knowingly used the Plaintiff's collateral contrary to what would have been the Plaintiff's wishes, and in breach of contract, her intent was nevertheless to preserve the value of the collateral, not to injure it.

*Id.* The Court concluded that a debtor's attempts to preserve the going concern value of the business demonstrate a lack of intent to cause injury. *Id.*

Importantly, the Court noted that while "the Debtor's actions blatantly breached the Security Agreement, § 523(a)(6) requires more than just a knowing breach of contract." *Id.* at 11.

Like the *Tomlinson* and *Wikel* cases, it is clear that the intent of the Debtor in the case at bar was to keep his farming business afloat, rather than an intent to harm Mayfield Grain or its collateral. In fact, Debtor's overall conduct toward Mayfield Grain evidences a desire to accommodate and protect Mayfield Grain's interests. Debtor executed the Security Agreement at issue *after* the debt was already incurred. The Agreement was executed on August 10, 1998, at Mayfield Grain's request. Debtor was not obligated or threatened by legal action to execute such an agreement, but voluntarily did so purely as an accommodation to Mayfield Grain.

At the time the Security Agreement was executed, Debtor owed a balance of $42,090.87. Part of the debt had been carried over from the previous year and all of it getting old and stale. The Security Agreement was executed for the purpose of documenting the amount owed and to provide Mayfield Grain with collateral. The Court also finds it significant that Debtor did not seek additional credit or obtain any funds at any time thereafter. The Court finds that these factors unequivocally demonstrate a lack of intent to cause injury. In fact, they are an indication of *good intent* on Debtor's behalf.

Unfortunately, Debtor's farming operation did not generate sufficient income to meet all of his financial obligations and still have funds left over to cover the farming expenses. Debtor experienced problems with regard to his 1998 crop. As a result of the drought that year, Debtor's crops yielded only 2/3 of the expected crop and to exacerbate the problem, prices dropped to about 1/2 the normal price. As a result, Debtor began to use a portion of the proceeds from the sale of crops to cover his farming expenses, putting the money back into his farming operations, rather than remitting the proceeds to Mayfield Grain, as he was required to do under the terms of the Security Agreement. Typically, Debtor would take his checks to the First National Bank, who had the first lien on the crops and proceeds. A portion was used first to make payment on the debt owed to the Bank and the remaining portion was used to pay farm expenses. There is no evidence of any funds being used to pay anything other than farm expenses.

It is clear from this evidence that Debtor's intent was to keep his farming operation afloat. There is simply no evidence of an intent to harm either Mayfield Grain or its collateral. Nor is there any evidence of Debtor attempting to reap a personal gain.

Debtor went to great lengths to cut both his personal expenses and to reduce the costs and expenses incident to the farming operation. Debtor traded his truck for a less expensive truck, and sold his home valued at approximately $100,000.00 to buy a mobile home valued at $24,000.00. He surrendered farm equipment upon which First National Bank had a lien and borrowed equipment from his uncle and neighbors. He did not finance his 1999 crop, fertilized only one field, reduced his fuel costs and paid for it with funds from a separate job. This further indicates that Debtor's primary focus and intent was to keep his farming business afloat.

The Court additionally finds from the evidence presented at trial that Debtor did not understand that his funneling of proceeds back into the farming operation, rather than remitting them to Mayfield Grain, constituted a breach of the terms of the Security Agreement. Paragraph 5 of the parties' Line of Credit Agreement states:

> All amounts due and payable by the Borrower to the Lender shall be paid in full on or before January 31, 1999.

Debtor testified at trial that he understood this to mean that he could sell his crops and use the proceeds as needed, exercising his discretion, as long as he "settled up" with Mayfield Grain by January 31, 1999. Moreover, Mayfield Grain's conduct reinforced that understanding. In several instances, Mayfield Grain was the purchaser of Debtor's crops, and thus, the drawer of the check that was ultimately negotiated. Mayfield Grain permitted Debtor to negotiate its checks at First National Bank, without remitting proceeds back to Mayfield Grain. Accordingly, these facts not only further support the finding that Debtor lacked an intent to harm Mayfield or its collateral, but additionally, as the Court found in the *Tomlinson* case, support a finding that Mayfield Grain acquiesced in Debtor's handling of the proceeds. *Tomlinson*, 220 B.R. at 138. Accordingly, Debtors conduct can hardly be characterized as "willful and malicious."

Finally, Mayfield Grain complains that Debtor's sale of crops to Reed Brothers, a purchaser who was not listed on "Debtor's List of Buyers of Farm Products," contained in the Security Agreement, was evidence of a wrongful intent on Debtor's behalf. The Court has carefully examined this paragraph of the Security Agreement and finds that it calls for the listing of "possible buyers" where Debtor "may" sell the crops. It reads:

> ... the farm products secured by such Security Agreement and Financing Statement *may be sold to* the following buyers, commission merchants, selling agents, *and to any other buyer, commission merchant or selling agent not*

*shown and [sic] the attached list.* (Emphasis supplied).

(Security Agreement and Financing Statement, last paragraph). The purpose of this provision is to enable the secured creditor to send a notice of its lien to the potential buyers. The Kentucky Revised Statutes place a $500 fine on a borrower who sells to a buyer not on the list without supplementing the list to include the actual buyer. Although lack of knowledge does not excuse such conduct, the Court notes that Debtor was unaware of the statutory duty to supplement. There is no reference to either the duty or the relevant statute in the Security Agreement.

The Debtor had sound reasons for selling his crops to Reed Brothers. It was only five miles from Debtor; therefore, Debtor's costs to haul the crop was much less than if Debtor had sold his crop to a more distant buyer.

The totality of the evidence causes the Court to find it was Debtor's intent to cover the expenses of his farming operation to keep it afloat, while also making payments to First National Bank, which held the first lien. Debtor thought he had until January 31, 1999 to pay Mayfield Grain. While this understanding was in error, it sheds light on his state of mind. There is simply no evidence that Debtor had the intent to harm Mayfield Grain or its collateral. Significantly, Bobby Whitford, the manager of Mayfield Grain even testified that he did not believe it was Debtor's intent to harm Mayfield Grain. Following the holdings of *Tomlinson* and *Wikel*, this Court finds that Debtor's conduct simply cannot be classified as "willful and malicious" under § 523(a)(6).

### CONCLUSION

For the above stated reasons, this Court will by separate Order overrule Mayfield Grain's Motion to Alter, Amend or Vacate Judgment.