In re Randy L. HAMMITT, Debtor.

Commerce Bank, N.A., Plaintiff,

v.

Randy L. Hammitt, Defendant.

In re Patricia Lynn Hammitt, Debtor.

Commerce Bank, N.A., Plaintiff,

v.

Patricia Lynn Hammitt, Defendant.

Bankruptcy Nos. 99–72074, 00–72188.
Adversary Nos. 99–7144, 00–7149.

United States Bankruptcy Court,
C.D. Illinois.

Oct. 5, 2001.

Thomas W. O'Neal, Peoria, IL, for creditor.

Frank E. Hoffman, Bloomington, IL, for debtor.

## OPINION

LARRY LESSEN, Bankruptcy Judge.

The issue before the Court is whether certain debts are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6).

The Defendants, who were married, started a livestock operation in the late 1980s. Mr. Hammitt took care of the cattle, and Mrs. Hammitt took care of the books. The cattle operation was a side business; both Defendants worked full time at State Farm Insurance Company. Both Defendants are educated; Mrs. Hammitt has a bachelor's degree in sociology and Mr. Hammitt has an associate's degree in agricultural production.

The Defendants did not pick an opportune time to enter the cattle business. Cattle prices were generally depressed during the time that they operated their cattle business. The cattle operation lost money every year, over $400,000 from 1992 to 1998. The Defendants never received any wages from their cattle operation. Instead, they were required to put over $100,000 of their non-farm income from their State Farm employment into the cattle operation. In addition, they borrowed over $100,000 from Mrs. Hammitt's father, most of it in the last year of operation for the cattle business, to keep the business afloat. Neither the Defendants nor Mrs. Hammitt's father were ever repaid any monies that they contributed to the cattle operation.

Beginning in 1992, Commerce Bank provided credit for the Hammitts' livestock operation. Commerce Bank's loans to the Hammitts were secured by a lawfully perfected security interest in the Hammitts' personal property, including, but not limited to, all machinery, cattle, and other equipment, fixtures, inventory, proceeds of collateral, all cattle or other livestock, together with all general intangibles and contract rights.

The Hammitts also executed and delivered to Commerce a Listing of Potential Buyers, Selling Agents or Commission Merchants dated March 14, 1995, which restricted where, through whom, and how the Hammitts could sell collateral. The listing document listed three entities through whom the Hammitts anticipated selling farm products described in the Se-

curity Agreement; Reels Sale Barn was not one of the three names. The listing document required the Hammitts to promptly notify the Bank of any sales to entities not on the list and to account for the proceeds. The Hammitts agreed to keep the list current and to notify the Bank of any changes. The Hammitts never made any changes and never reported any sales to entities not on the list from March, 1998, to February, 1999.

On March 14, 1995, the Hammitts signed a promissory note in the amount of $200,000 payable to Commerce Bank. The Hammitts signed another $200,000 note payable to Commerce on May 1, 1996. Both notes referred to the financing statement and security agreement dated March 18, 1992.

On June 9, 1997, the Hammitts signed a new note for $260,000. The note was due on November 30, 1997, and it referred to there being collateral for the loan. A new note for $260,000 was signed on May 4, 1998, and it provides that it is a renewal of the note dated June 9, 1997. The collateral for this note was Commerce-secured cattle, machinery, and equipment, and the equity owned by the Hammitts in certain cattle contracts with Interstate Producers Livestock Association ("IPLA"). The note became fully due and payable on December 15, 1998.

In connection with their financing, the Hammitts provided financial statements to Commerce Bank on May 1, 1997, and June 30, 1998. Both financial statements reflect net worth of over $575,000 with significant value in livestock. Mr. Hammitt signed both the May 1, 1997, and July 30, 1998, financial statements. Mrs. Hammitt signed only the July 30, 1998, financial statement.

On January 20, 1998, Mr. Hammitt presented Commerce with a written current inventory of cattle and feed. The inventory listing typed, signed, and provided by Mr. Hammitt to Commerce Bank stated that, on January 16, 1998, he had the following:

| | |
|---|---:|
| 209 bred heifers—$1,000 per head | $209,000 |
| 41 1200 lb. open heifers on feed—1200 × .64 = $768 | $ 31,488 |
| 10 1000 lb. open heifers on feed—1000 × .64 = $640 | $ 6,400 |
| 32 first calf heifers (all calves are AI sired)—$1200 per pair | $ 38,400 |
| 535 open replacement heifers—750 lbs. $700 a head | $374,500 |
| 15 breeding bulls × $2000 | $ 30,000 |
| 40 purebred cows (most have just calved) | $ 32,000 |
| 3 stud bulls $5,000 | $ 15,000 |
| | $736,788 |

| | |
|---|---:|
| Feed on hand: | |
| 300 ton of silage at $30 a ton | $ 90,000 |
| 500 ton of hay at $80 a ton | $ 40,000 |
| | $130,000 |
| | $866,788 |

In March, 1998, the Hammitts were delinquent on their Commerce loan. The Hammitts had been paying the interest on the Commerce loans and Commerce kept renewing the loans. The Hammitts met with Commerce representatives in March, 1998, for the purpose of putting together a plan which would pay down the Commerce debt. The parties agreed that the Hammitts would feed and breed various cattle and sell them in September and Decem-

ber, 1998, with a significant amount of the proceeds to be paid to Commerce Bank.

In connection with the May 4, 1998, promissory note, the Hammitts signed a Disbursement Report and Authorization. This document required the Hammitts to advise the Bank of any material change in their financial condition. The financial statements signed by the Hammitts contained similar language. The Hammitts never notified the Bank of any such material change.

The cattle market was so bad in September, 1998, that Mr. Hammitt canceled the sale planned for that month. The Hammitts acquired another 276 head of cattle through the IPLA custom feeding program on October 20, 1998. The Hammitts planned to feed them and sell them at a profit. Commerce complained that the acquisition of the IPLA cattle in October was not contemplated by the March agreement. However, nothing in the agreement prevented the Hammitts from acquiring cattle through IPLA.

The Hammitts advertised their upcoming December sale in an August, 1998, publication called *The Show Circuit*. The publication showed the Hammitts planned to sell 800 head on December 12, 1998. The Hammitts testified that they actually brought 747 head to Reel's Sale Barn for the sale on December 12, 1998.

In the fall of 1998, the Hammitts transferred cattle, equipment, and machinery to third parties in exchange for feed and labor. All the non-IPLA cattle were sold at Reel's for slaughter prior to the December sale. This included 30 head of purebred cows secured by Commerce and valued by the Hammitts at $60,000 in their financial statement of July 30, 1998. Marv Jones received a stacker, chutes, gates, a couple of wagons, corrals, fencing and a cow. The 4020 tractor, valued at $8,000 in the July financial statement, was trans-

ferred to Carl Neubauer. Mr. Neubauer also received the bale trailer valued at $3,000. Mark Erdman received a $10,000 cattle trailer. The Greenwoods received two bulls. Mr. Hammitt testified that the Greenwoods received the bulls in payment for labor, but admitted that they probably would have worked for free.

While the equipment was sold or transferred prior to the first sale in December, 1998, the Hammitts were allowed to use some of the equipment until after the sale. The Hammitts were aware that Commerce had a security interest in the cattle, equipment, and machinery, and they transferred the collateral without the permission of Commerce. The Hammitts testified that they were just trying to keep the cattle fed and the business going when they made the transfers.

The December, 1998, sale of cattle resulted in proceeds of $71,977.24 payable to the Hammitts. The Hammitts deposited their check from the December sale in their Commerce checking account. The proceeds from the sale were within the range contemplated by the parties at their March meeting. No one from Commerce attended the December sale.

Although the $71,977.24 check from the December sale was deposited in a Commerce Bank account, Commerce officials testified that they were unaware of the funds being deposited with their Bank.

Instead of paying Commerce Bank, the Hammitts paid $72,277.41 to a host of individuals and entities. Mrs. Hammitt wrote the checks and decided who to pay. The bills paid included a house payment, phone bills, utilities, truck payment, credit cards, cookies, and other things. A large payment of $24,127.84 was made to Ron Miller Trucking. None of the individuals or entities paid from the cattle sale proceeds had a security interest in those proceeds.

Not all of the Hammitts' cattle sold at the December sale. A second sale was set for February, 1999. The Hammitts realized that they were not going to get any proceeds from this second sale. All of the proceeds from the February sale went to IPLA. Commerce did not have advance notice of the February sale.

Mr. Hammitt testified that there were no Commerce-secured cattle left even before the December, 1998, sale. It is unclear what happened to the Commerce cattle, or how many cattle were secured to Commerce. Commerce never took an actual head count inventory of its cattle.

On March 8, 1999, Commerce Bank filed a complaint against the Hammitts in the Circuit Court of McLean County. Mr. Hammitt filed a petition pursuant to Chapter 7 of the Bankruptcy Code on June 14, 1999. He listed the Commerce debt as $277,770.31. Commerce obtained a judgment against Mrs. Hammitt on October 4, 1999. Mrs. Hammitt filed her bankruptcy petition on July 12, 2000. Her schedules showed Commerce holding a debt of $260,000.

Commerce Bank has filed adversary complaints against both Mr. and Mrs. Hammitt. Commerce asserts that its debts are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6).

Section 523(a)(2)(A) of the Bankruptcy Code states in part as follows:

> A discharge under section 727... of this title does not discharge an individual debtor from any debt... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud...

11 U.S.C. § 523(a)(2)(A).

■ In order to prove a case under this provision, courts have traditionally required a plaintiff to prove by a preponderance of the evidence that (i) the debtor made false statements which he knew to be false, or which were made with such reckless disregard for the truth as to constitute willful misrepresentations; (ii) the debtor possessed the requisite *scienter,* i.e. he actually intended to deceive the plaintiff, and (iii) to his detriment, the plaintiff justifiably relied on the representations. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Mayer,* 51 F.3d 670, 673 (7th Cir.1995), *cert. denied* 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *In re Sheridan,* 57 F.3d 627, 635 (7th Cir.1995); *In re Scarlata,* 979 F.2d 521, 525 (7th Cir.1992); *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, the Seventh Circuit has recently held that "actual fraud" is not limited to misrepresentation, but may encompass "'any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000) *quoting* 4 Lawrence P. King, *Collier on Bankruptcy,* ¶ 523.08(1)(e), p. 523–45 (15th ed. Revised, 2000).

■ Commerce's § 523(a)(2)(A) claim centers on the March, 1998, meeting with the Hammitts. Commerce asserts that the Hammitts deceived the Bank with their plan at this meeting. According to Commerce, the plan included feeding and breeding IPLA cattle for sale in the fall, maintaining Commerce's secured cattle, and not purchasing additional cattle.

Contrary to Commerce's assertions, the March, 1998, agreement between Commerce and the Hammitts did not limit further purchases of IPLA cattle. Moreover, there was no discussion in the March, 1998, meeting about slaughtering Commerce cattle.

The plan presented to Commerce by the Hammitts in March, 1998, involved selling enough cattle at a good enough price to pay down the Commerce loans. The Hammitts' plan was based on their projection that the cattle market would rise from its depressed state. Unfortunately, the market did not rebound until the summer of 1999, too late to help the Hammitts. The failure of the Hammitts to accurately predict the cattle market does not constitute a fraud. The Court does not believe that the Hammitts intended to deceive Commerce when they submitted their plan in March, 1998. Therefore, Commerce's claim under § 523(a)(2)(A) is denied.

Section 523(a)(2)(B) of the Bankruptcy Code states in part as follows:

(a) A discharge... does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property or services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive(.)

11 U.S.C. § 523(a)(2)(B).

■ Commerce must prove each of these elements by a preponderance of the evidence in order to succeed under this section. *In re Miller*, 39 F.3d 301, 304 (11th Cir.1994).

■ The July, 1998, financial statement was submitted to Commerce more than two months after Commerce extended the Hammitts' financing. Therefore, Commerce could not have reasonably relied on this financial statement when it refinanced the Hammitts' cattle operation.

As to the 1997 financial statement, Mrs. Hammitt points out that she did not sign this financial statement. While there is no requirement under § 523(a)(2)(B) that the debtor sign the financial statement, the debtor must affirm the writing in some respect, as by using or adopting it. *In re Eckert*, 221 B.R. 40, 44 (Bankr.S.D.Fla. 1998). In this case, the financial statement purports to be the financial statement of both "Randy and Trish Hammittt." Both of their 401(k) plans are listed on the statement. The financial statement was signed by Randy Hammitt, Mrs. Hammitt's husband and partner or joint venturer in the cattle operation, and Mrs. Hammitt knew that a financial statement was required in connection with the refinancing in 1997. Mrs. Hammitt never told the Bank that Randy did not have the authority to sign the financial statement on behalf of both of them. Under these circumstances, the Court finds that Mrs. Hammitt "published" the financial statement by allowing her husband to sign it and submit it to Commerce.

Commerce has failed to prove that the financial statement was materially false when the Hammitts published it in 1997. Indeed, Commerce relies on the accuracy of the values in its argument under § 523(a)(6). It is undisputed that the Hammitts' assets are valued much higher in their 1997 financial statement than in their bankruptcy petitions. However, the Hammitts offered credible explanations for the disparity in values. The value of the farm dropped by over $140,000 because the Environmental Protection Agency ruled that the Hammitts cannot have cattle on the real estate because of a manure problem. (The Hammitts never removed

manure from the farm.) The cleanup costs for the real estate are huge. The value of the Hammitts' equipment dropped from $137,000 at the time of the financial statement to $5,000 at the time of their bankruptcies because some of the equipment was bartered for labor and feed, the end loader burned up, and the cattle outbuildings deteriorated to the point that they were worthless. The May, 1997, financial statement listed 503 head of livestock and valued the livestock at $530,850. All of the livestock was gone by the time the Hammitts filed their bankruptcy petitions. The evidence showed that some of the cattle died, some were slaughtered, some were bartered for labor, and the balance were sold at the December, 1998, or February, 1999, sales. Commerce did not produce any evidence to show that the livestock were overvalued in May, 1997.

Commerce also failed to prove that the Hammitts published the 1997 financial statement with an intent to deceive Commerce. The Hammitts testified that they believed that the figures in the financial statement were accurate in 1997. In fact, there was testimony that the 1997 financial statement was prepared for the Hammitts' signature by a Commerce employee, Dean Carr, and that Mr. Carr was instrumental in determining the value of the assets and the amount of liabilities. The 1997 financial statement was one in a series of financial statements submitted to the Bank over a number of years. No new money was advanced as a result of the financial statement. The Hammitts paid the yearly interest on the note, and the note was rolled over for another year. The submission of the financial statement to Commerce by the Hammitts was a routine matter in the Hammitts' relationship with the Bank, and the Court believes the Debtors when they say that they did not give it much thought. They did not intend to deceive Commerce when they submitted it.

Under § 523(a)(6), a discharge in bankruptcy does not discharge a debtor from a debt for "willful and malicious injury by a debtor to another entity or property of another entity." 11 U.S.C. § 523(a)(6). Under the Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), in order for a debt to be nondischargeable under this provision, it must be a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Discussing the standard to be applied in cases involving conversion of collateral under § 523(a)(6) after *Geiger*, the court in *In re Kidd*, 219 B.R. 278, 285 (Bankr.D.Mont.1998), stated:

> [A] creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believes that the consequences were substantially certain to result from the debtors (sic) acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

Though the standard in these cases may have changed, it remains clear that each case must be determined on its unique facts. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Endicott*, 254 B.R. 471 (Bankr.D.Idaho 2000).

Commerce contends that the Hammitts violated § 523(a)(6) by transfer-

ring cattle, equipment, machinery, and $71,977.24 in cattle sale proceeds to unsecured creditors. It is beyond dispute that Commerce had a valid security interest in the above-referenced items, that the Hammitts were aware of Commerce's security interest, and that they sold, transferred or bartered the collateral without the permission of Commerce and without giving the proceeds of the transfers to Commerce.

The Hammitts argue that the conversion of the Commerce collateral was necessary to keep the cattle operation in business. The Hammitts advanced costs in anticipation of a large sale in September, 1998, but the sale was postponed because of poor market conditions. This forced the Hammitts to incur additional expenses in feeding and caring for the cattle from September through December, 1998. In addition, the Hammitts acquired additional IPLA cattle which had to be fed and cared for. Because the Hammitts did not have the cash to pay for labor and feed, Mr. Hammitt negotiated to barter some of his equipment for labor. Mr. Hammitt testified that he thought that everyone would get paid in full from the proceeds of the December and February sales. Instead, the market remained low, the Hammitts came up short, and Commerce was not paid.

The Hammitts argue that they did not commit a willful and malicious act within the meaning of § 523(a)(6) when they converted Commerce's collateral without the consent of Commerce and in a manner inconsistent with the terms of the security agreements and listing agreement because they were trying to keep their business afloat. There is some support for this theory in several post-*Geiger* decisions. In *In re Adkisson,* No. 00–80897, Adv. No. 00–8097, 2001 WL 34076353 (Bankr.C.D. Ill., April 12, 2001), the debtor knew that the creditor had a "barnyard lien" on ma-

chinery and the cattle herd, but the debtor did not forward all of the proceeds from the sale of the collateral to the secured creditor. The debtor testified that the proceeds not turned over to the secured creditor were used to pay ordinary farming expenses as well as court-ordered child support payments and other ordinary living expenses. Some of the proceeds from cattle sales were deposited in the debtor's account with the secured creditor, and checks for miscellaneous expenses were written from this account. The Court found that there was not a violation of § 523(a)(6) because the debtor had a reasonable belief that he could continue to use a portion of the proceeds from the sale of cattle to pay his expenses. The secured creditor knew that the debtor lacked operating funds, had no other source of income, and needed to care for and maintain his herd. The debtor's deposit of his checks for livestock sales in his account with the secured creditor showed the debtor's lack of subjective intent to injure the secured creditor.

In *In re Crump,* 247 B.R. 1, 6–7 (Bankr. W.D.Ky.2000), the debtor failed to remit grain proceeds to the secured creditor. The Court found that the debtor's actions were not willful and malicious because his intent was to keep the business afloat. There was no evidence that the debtor had any intent to do harm. Even the secured creditor's manager testified that he did not believe that the debtor intended to harm the creditor. There was also evidence that the creditor acquiesced in the debtor's handling of the proceeds; the creditor bought some grain from the debtor, issued the debtor a check, and allowed the debtor to negotiate the check without remitting the proceeds back to the creditor. Finally, there was significant evidence of the debtor's good intent; the debtor cut his personal and farming expenses. Under these circumstances, the Court could not consid-

er the debtor's actions to be "willful and malicious" under § 523(a)(6).

The *Crump* court based its decision on the holding in *In re Tomlinson*, 220 B.R. 134 (Bankr.M.D.Fla.1998) and *In re Wikel*, 229 B.R. 6 (Bankr.N.D.Ohio 1998). In *Tomlinson*, the court found that the debtor's failure to turn over all inventory sale proceeds was not willful and malicious because the debtor reinvested the proceeds in his business and voluntarily surrendered his remaining inventory. In addition, the creditor continued to ship merchandise to debtor after the creditor's periodic inspection revealed that the debtor had failed to remit certain sale proceeds in violation of the security agreement. In *Wikel*, the court found that the debtor did not willfully and maliciously injure the creditor's collateral by using the secured creditor's accounts receivable funds to pay unsecured debts without the secured creditor's consent. Although the debtor avoided contact with the secured creditor, the debtor did not intend to injure the secured creditor's collateral. The Court found that the debtor intended to preserve the value of the collateral and the value of the business as a going concern so that the business might be sold.

In *In re Howard*, 261 B.R. 513 (Bankr. M.D.Fla.2001), the debtor sold motor homes out of trust and failed to remit proceeds to the secured creditor. The court cited *Crump, Tomlinson*, and *Wikel*, but distinguished them because they involved situations where the debtor's primary motive was to keep the business alive. In *Howard*, there was evidence that the debtor was hostile to the secured creditor and blamed the secured creditor for the failure of his business. The court found that the debtor misappropriated the secured creditor's funds in order to exact retribution from the secured creditor. Because the debtor intended to injure the

secured creditor by not remitting the proceeds from the sale of the creditor's collateral, the court found the debt to be nondischargeable under § 523(a)(6).

As indicated in the above-cited cases, the Court must look at the totality of the circumstances to determine whether a conversion is a mere knowing breach of contract or a willful and malicious injury. Factors to be considered include the following:

1. Intent of the debtors—Did the debtors intend to harm the creditor or its collateral?

2. What happened to the money—Did the debtors put the proceeds from the conversion back into their business or did they use the proceeds to reap a personal gain?

3. Actions of the creditor—Did the secured creditor acquiesce in the debtors' actions?

In the instant case, there is no evidence that the Debtors bore any dislike or hostility towards Commerce. The Debtors did not blame Commerce for their financial problems. The Debtors' lack of a subjective intent to injure Commerce is evidenced by their deposit of the sale proceeds in their Commerce account. *See Adkisson, supra* at p. 8. The Debtors intended to pay off Commerce with the proceeds from the fall sale.

It is clear from all the evidence that the Debtors' intent was to keep their cattle operation afloat. The Debtors sold, traded, or bartered the machinery, equipment, and cattle in order to care for the cattle herd. The Debtors needed feed and labor to care for their herd, and the proceeds from the conversion of the Commerce collateral were used for these purposes. There was no evidence of the Debtors attempting to reap a personal gain; all of the proceeds went back in to the cattle operation.

The Debtors went to great lengths to keep their cattle operation going. It was undisputed that the Debtors worked long hours on the farm. It was also undisputed that the Debtors put their own money and over $100,000 from Mrs. Hammitt's father into the cattle operation. This is evidence of the Debtors' good faith and their primary intent of keeping the business afloat.

Because the Debtors' primary intent in converting the Commerce-secured machinery equipment and cattle was to keep their cattle business afloat rather than to injure Commerce, the Debtors' conduct cannot be classified as "willful and malicious" under § 523(a)(6).[1] However, this analysis does not apply to the $71,977.24 check from the December sale. The sale did not bring the prices hoped for by the Debtors, and it was clear following the sale that the cattle operation was finished. The Debtors recognized that they would not receive any money from the February, 1999, sale. Nevertheless, the Debtors used the $71,977.24 to pay unsecured creditors rather than Commerce, which had a lien on the funds. The Debtors knew that Commerce had a lien on the funds, that Commerce had not consented to the use of its money to pay other debts, and that they would not realize any further money from their cattle operation. The Debtors cannot excuse their conversion of the $71,977.24 check by claiming that they were trying to keep the business afloat; the cattle operation had already sunk by this point. Therefore, the Court finds the debt of $71,977.24 to be nondischargeable pursuant to § 523(a)(6).

For the foregoing reasons, the Court finds the Debtors' debt of $71,977.24 to be nondischargeable pursuant to 11 U.S.C. § 523(a)(6), and the balance of the Debtors' debt to be dischargeable.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

---

1. Since the United States Supreme Court decided *Kawaauhau v. Geiger, supra,* the threshold level required to prove a willful and malicious conversion has substantially increased. The plaintiff must now, in effect, show that the conduct of the debtor was deliberate and intended to harm the plaintiff.

The courts are still in the process of interpreting this decision and determining the standards and guidelines for deciding a case under § 523(a)(6). Whatever standard is utilized, a decision must be based on the totality of facts and circumstances. Some courts seem to place a great deal of emphasis not only on the subjective intent of the debtor but also the use to which the debtor puts the proceeds of the conversion. In other words, did the debtor use the proceeds to keep the business going with the intent to pay all of the creditors and not for personal gain?

This Court would emphasize that the use to which the debtor puts the proceeds is only one factor to consider. The fact that a debtor uses the proceeds to keep the business afloat will not, in and of itself, be a total defense to a § 523(a)(6) action.